**SHELL OIL COMPANY, Plaintiff,**

v.

**Juanita M. KREPS et al., Defendants.**

**ALASKA BULK CARRIERS, INC., and Trinidad Corporation, Plaintiffs,**

v.

**Juanita M. KREPS et al., Defendants.**

**Civ. A. Nos. 77–1645, 77–1647.**

United States District Court,
District of Columbia.

Nov. 22, 1977.

As Corrected March 6, 1978.

Stephen N. Shulman, Joseph A. Artabane, Mark C. Ellenberg, Washington, D.C., for plaintiff, Shell Oil Co.

Amy Loeserman Klein, William Karas, Olga Boikess, Jean H. Lewis, Dale C. Andrews, David P. Street, Washington, D.C., for plaintiffs Alaska Bulk Carriers, Inc., and Trinidad Corp.

R. Joseph Sher, Washington, D.C., for defendants.

John W. Vardaman, William E. McDaniels, Neal Michael Mayer, Jonathan Blank, Washington, D.C., for defendant-intervenors Polk Tanker Corp. and Seatrain Shipbuilding Corp.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

These consolidated cases are presently before the Court on cross-motions for summary judgment.[1] Plaintiffs herein, Shell Oil Company (Shell), Alaska Bulk Carriers, Inc. (Alaska Bulk), and Trinidad Corporation (Trinidad), seek judicial review of certain actions taken by the defendants, Juanita M. Kreps, Secretary of Commerce, the Maritime Administration (MarAd), Robert J. Blackwell, Assistant Secretary of Commerce for Maritime Affairs, and the three

---

1. Defendants and defendant-intervenors have, in the alternative, moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. However, because the Court has considered matters outside the pleadings, the Court has, pursuant to the last sentence of Fed.R.Civ.P. 12(b), treated defendants' and defendant-intervenors' motions solely as motions for summary judgment pursuant to Fed.R.Civ.P. 56.

members of the Maritime Subsidy Board (MSB). The actions challenged relate to the Secretary's decision to remove domestic trading restrictions from the ship known as the S. S. STUYVESANT in exchange for the repayment of a construction-differential subsidy (CDS) of some $27.2 million by the Polk Tanker Corporation (Polk), the owner of the STUYVESANT and a wholly-owned subsidiary of Seatrain Lines, Inc. Polk and Seatrain Shipbuilding Corporation (Seatrain Shipbuilding), the builder of the STUYVESANT and another wholly-owned subsidiary of Seatrain Lines, Inc., were permitted to intervene herein as party-defendants.

The cross-motions for summary judgment now before the Court present four legal issues: (1) whether the Secretary has the legal authority under the Merchant Marine Act of 1936 to remove domestic trading restrictions upon the operation of a vessel built with CDS in exchange for repayment in full of the CDS; (2) if the Secretary has such legal authority to remove domestic trading restrictions, whether she has the legal authority to accept as repayment therefor a promissory note payable over 20 years; (3) whether the procedures utilized by the Secretary in taking the actions here in issue deprived plaintiffs of property in violation of the Due Process Clause of the fifth amendment; and, finally, (4) whether the Secretary's decision to exercise such authority on the facts of the instant case was arbitrary and capricious or otherwise violative of the Administrative Procedure Act (APA).

For the reasons hereinafter stated in sections III and IV, *infra*, the Court concludes that the Secretary has the legal authority both to remove permanently domestic trading restrictions from a CDS vessel in exchange for CDS repayment and to accept a 20-year promissory note as repayment. The Court further concludes that the procedures utilized by the Secretary did not deprive plaintiffs of any property interest cognizable under the Due Process Clause. Accordingly, the Court will grant defendants' and defendant-intervenors' motions for summary judgment as to these issues. However,

for the reasons set forth in section V, *infra*, the Court concludes that the Secretary failed to consider relevant factors in making her decision to take the actions herein challenged, and the Court therefore concludes that these actions are arbitrary and capricious and an abuse of discretion, within the meaning of section 10(e) of the APA, 5 U.S.C. § 706(2)(A). Accordingly, the Court will grant plaintiffs' motion for summary judgment on this issue, and will remand this matter to the Secretary for further consideration in accordance with this opinion.

## I. STATUTORY FRAMEWORK

Title V of the Merchant Marine Act of 1936, (the Act), *as amended*, 46 U.S.C. §§ 1151 *et seq.*, empowers the MSB to award a "construction-differential subsidy" (CDS) to persons building new vessels for use in the "foreign commerce of the United States." 46 U.S.C. § 1151(a). Such a subsidy is intended to equalize the costs of vessel construction between United States and foreign shipyards, where construction costs are lower as a result of lower labor and material costs and/or foreign government subsidies. The CDS program thus enables ships built in the United States to compete in charter rates against foreign-built ships. *See generally Moore-McCormack Lines, Inc. v. United States*, 413 F.2d 568, 188 Ct.Cl. 644 (1969).

No such CDS, however, is necessary for ships not in competition with foreign-built ships. Section 27 of the Merchant Marine Act of 1920, *as amended*, 46 U.S.C. § 883, provides that only vessels "*built in* and documented under the laws of the United States and owned by persons who are citizens of the United States" may engage in domestic trade—trade "between points in the United States, including Districts, Territories, and possessions thereof embraced within the coastwide laws." (Emphasis added.) *See American Maritime Association v. Blumenthal*, No. 77–1508 (D.D.C. October 14, 1977). Since no foreign-built ships can compete in domestic trade

with the higher-cost United States-built ships, no CDS may be paid to United States ships engaged in domestic trade.

In order to protect the unsubsidized vessels, United States ships that are built with the aid of CDS are prohibited from engaging in domestic trade since they are able to offer lower charter rates than unsubsidized United States ships. This prohibition, codified in section 506 of the 1936 Act, 46 U.S.C. § 1156, is the focal point of this litigation. This section, quoted in its entirety in section III(b) *infra*, requires recipients of CDS to agree not to operate the subsidized vessel in domestic commerce, though it does provide a mechanism whereby the Secretary can waive such domestic trading restrictions for up to six months per year in exchange for a *pro rata* repayment of CDS.

One final statutory provision of relevance to this case is Title XI of the Act, 46 U.S.C. §§ 1271 *et seq.*, which authorizes the Secretary to provide loan guarantees for the financing of United States-built vessels. Section 1104(a)(3) of the Act, 46 U.S.C. § 1274(a)(3), authorizes the use of such guarantees for the "financing, in whole or in part, [of] the repayment to the United States of any amount of construction-differential subsidy paid with respect to a vessel pursuant to title V of the Act." Other subsections of section 1104(a) set forth other types of financing for which loan guarantees may be made. Section 1104(b)(2) provides that such financing may not exceed 87.5 per cent of the cost of vessels constructed without CDS and may not exceed 75 per cent of the cost of vessels constructed with CDS.

## II. FACTUAL BACKGROUND.

On June 30, 1972, the MSB executed CDS contracts with intervenors Seatrain Shipbuilding and Polk for a 225,000 deadweight ton (DWT) tanker now known as the STUYVESANT. Pursuant to Board Contract Nos. MA/MSB–164 and MA/MSB–165, the MSB agreed to pay CDS funds to Seatrain Shipbuilding, and Polk, as the vessel purchaser, agreed to operate the STUYVESANT in the foreign trade of the United States, as required by section 506 of the Act.

Pursuant to the CDS contracts, Seatrain received $27.2 million in construction subsidies for the STUYVESANT which represents approximately 26 per cent of the total construction cost of some $102.7 million. In addition, pursuant to Title XI of the Act, the Secretary guaranteed some $30.2 million in loans. Finally, the Economic Development Administration (EDA), another agency of the Department of Commerce, made loans of $5 million and guaranteed, to the extent of 90 per cent, approximately $82 million in additional loans to Seatrain Shipbuilding for the purpose of developing and maintaining the shipbuilding facilities of the former Brooklyn Navy Yard.

Construction of the STUYVESANT was completed in 1977. Efforts by Polk to find employment for the STUYVESANT in the foreign trade of the United States proved unavailing as a result of an excess supply of tanker tonnage in foreign trade and other factors influencing the volume of such foreign trade. As a result, Polk sought other employment opportunities for the STUYVESANT and began negotiations with the Standard Oil Company of Ohio [(SOHIO)] for the transportation of SOHIO's Alaskan oil to the continental United States. These negotiations culminated on June 21, 1977, in an agreement between Polk and SOHIO for a three-year time charter of the STUYVESANT provided that the vessel became qualified to engage in domestic trade.

On July 8, 1977, in order to so qualify the STUYVESANT for carrying SOHIO's Alaskan oil in domestic trade, Polk filed with the Assistant Secretary of Commerce for Maritime Affairs (hereinafter, MarAd/MSB) an application seeking waiver of the domestic trade restrictions of section 506 for a three-year period in exchange for a *pro rata* repayment of CDS. MarAd/MSB assigned the application Docket No. S–565, and notice of the application was published in the Federal Register on July 19, 1977. 42 Fed.Reg. 37,229 (1977). Plaintiffs Shell and Alaska Bulk and others filed comments in opposition to Polk's application, and Polk subsequently withdrew the application on August 26, 1977.

On August 25, 1977, Polk had filed a second application with MarAd/MSB. This

application requested the Secretary and her designees to amend the CDS contract with Polk to permit Polk to repay in full the CDS already paid for the STUYVESANT in exchange for the removal of the section 506 domestic trading restrictions to which Polk had agreed. As stated in Polk's August 25 application itself, the purpose of this requested "[c]ancellation of the Title V contract" was to "permit the operation of the Vessel in the Alaska (domestic) trade without further permission from the United States." Exhibit D, Stipulation of Undisputed Facts, at 1. This application by Polk was not published in the Federal Register.

On August 30, 1977, MarAd/MSB took a series of actions with respect to the August 25, 1977, application of Polk; these actions are set forth in two letters dated August 31, 1977, from MarAd/MSB to Polk and Queensway Tanker, Inc. In these letters, MarAd/MSB agreed, *inter alia*, to release the STUYVESANT permanently from section 506 domestic trading restrictions in exchange for Polk's repayment of the $27.2 million CDS by means of a 20-year interest-bearing promissory note secured by a third preferred ship mortgage on the vessel. In addition, MarAd/MSB approved the following transactions and attendant sale of Title XI-guaranteed bonds, which were in fact consummated on September 30, 1977. At closing, Polk transferred the STUYVESANT to the United States Trust Company (USTC) as owner-trustee for the equity-owner, General Electric Credit Corporation (GECC) and the above-described collateralized promissory note to the Secretary for $27.2 million as repayment for the full amount of CDS. The note was then transferred to USTC which assumed responsibility for $60.2 million of government-insured indebtedness on the STUYVESANT. Of that amount, $31.3 million is indebtedness incurred at the closing through the sale of bonds. The proceeds of these bonds was then used to repay loans of $28 million guaranteed by the Economic Development Administration. USTC also paid Polk $32.6 million, which was placed in an escrow account for the benefit of the equity-owner, GECC. USTC then bareboat-char-

tered the STUYVESANT to Queensway Tankers, Inc., which in turn time-chartered the vessel to SOHIO for three years for the purpose of transporting Alaskan oil to the continental United States.

The above-described transactions, of which the Secretary's decision to remove domestic trading restrictions upon the STUYVESANT was an integral part, were originally scheduled for closing on September 23, 1977. But on September 22, 1977, plaintiffs filed these suits and sought a temporary restraining order (TRO) to prevent the scheduled closing. The parties appeared before Judge Gasch on that date, and he granted the requested TRO and scheduled the hearing on plaintiffs' motion for a preliminary injunction for September 29, 1977, before this Court.

On September 29, 1977, this Court heard extensive arguments on plaintiffs' motion for preliminary injunctive relief. Upon consideration of these arguments and the parties' comprehensive memoranda, and based on its consideration of the four factors enunciated in *Virginia Petroleum Jobbers Association v. FPC*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), the Court found that plaintiffs had failed to demonstrate that they would incur immediate and irreparable injury if the requested relief were denied. The Court therefore, on September 30, 1977, denied plaintiffs' motion for a preliminary injunction. Thereafter, on that same day, the financial transactions involving the STUYVESANT were closed. Since that time, the parties have engaged in extensive and expedited discovery, and, as a result, they have filed the instant cross-motions for summary judgment.

III. THE SECRETARY OF COMMERCE HAS AUTHORITY UNDER THE MERCHANT MARINE ACT OF 1936 TO ACCEPT TOTAL REPAYMENT OF CONSTRUCTION–DIFFERENTIAL SUBSIDY AND TO WAIVE PERMANENTLY DOMESTIC TRADING RESTRICTIONS IN EXCHANGE FOR SUCH REPAYMENT.

■ The threshold issue before the Court is whether the Secretary has authority to

accept total repayment of CDS in exchange for the removal of the domestic trade restrictions imposed by section 506 of the Act, 46 U.S.C. § 1156. Resolution of this issue requires this Court to determine first whether the Secretary has the general authority to accept total repayment of CDS after the subsidy contract has been executed, and second, whether section 506 bars the Secretary from removing domestic trade restrictions in exchange for such total repayment.

### A. The Secretary's General Contractual Authority

All parties appear to be in agreement that the Secretary possesses a "general authority" to accept total repayment of CDS. Thus, plaintiffs Alaska Bulk and Trinidad state unequivocally that they "have no quarrel with [the acceptance of] total CDS repayment" as long as such acceptance is not accompanied by a removal of domestic trade restrictions.[1a] None of the parties, however, has pointed to any particular statutory provision(s) that expressly authorizes the Secretary to accept total CDS repayment under any circumstances.

Defendants and defendant-intervenors have asserted that this power is *inherent* in sections 504, 1104(a)(3), and 207 of the Act, 46 U.S.C. §§ 1154, 1274(a)(3), & 1117, and in section 105(1) of the Reorganization Plan No. 21 of 1950 [Plan 21], 64 Stat. 1273 (1950), and section 202(b)(1) of Reorganization Plan No. 7 of 1961 [Plan 7], 75 Stat. 840 (1961). While plaintiffs admit, as indicated above, that the Secretary has such inherent authority to accept total CDS repayment except when such repayment is barred by another provision of the Act, they express neither agreement nor disagreement with the provisions relied upon by defendants and defendant-intervenors.

The Court has carefully analyzed the provisions invoked by defendants and defendant-intervenors. On the basis of this analysis, the Court concludes that the Secretary does in fact possess general authority to accept total CDS repayment in appropriate cases. The Court agrees with defendants and defendant-intervenors that such authority is inherent in the Secretary's broad contractual authority provided by sections 504 and 207, 46 U.S.C. §§ 1154 and 1117. The Court further agrees that this authority is expressly contemplated by section 1104(a)(3), 46 U.S.C. § 1274(a)(3), which provides that the Secretary

> may guarantee or make a commitment to guarantee, payment of the principal and interest on an obligation which aids in—
>
> (3) financing, in whole or in part, the repayment to the United States of any amount of construction-differential subsidy paid with respect to a vessel pursuant to [Title V].

Finally, the Court also finds that the two reorganization plans cited by defendants and defendant-intervenors demonstrate that the Secretary of Commerce has authority not only for making Title V [CDS] subsidy contracts, but also, in the words of section 105(1) of Plan 21, for "amending and terminating [such] contracts." While these reorganization plans cannot be interpreted to "authoriz[e] an agency to exercise a function which is not expressly authorized by law at the time the plan is transmitted to Congress," 5 U.S.C. § 905, they nevertheless demonstrate (1) that the Secretary's broad contractual authority with respect to CDS contracts has been construed expansively, and (2) that Congress was aware of, and approved, at least implicitly, such an expansive construction. For these reasons, the Court holds that the Secretary has authority to accept total CDS repayment under appropriate circumstances.

### B. The Effect of Section 506

█ Plaintiffs contend that, notwithstanding any general authority which the

---

**1a.** Reply Memorandum of October 20, 1977, at 5 n. 5. Plaintiff Shell adopts this same position in its Memorandum of October 13, 1977, at 24 n. *. As two examples of "permissible" CDS repayment, plaintiffs cite: (1) CDS repayment for the purpose of obtaining 87½% Title XI financing under 46 U.S.C. § 1274(b)(2), rather than 75% financing; and (2) CDS repayment for the purpose of obtaining permission to engage in foreign-to-foreign trade, rather than trade between the United States and foreign countries.

Secretary may have, section 506 precludes any removal, or waiver, including a permanent one, of domestic trade restrictions *except* for the six-month waivers expressly authorized by this section. Section 506 provides:

> Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade, or on a round-the-world voyage, or on a round voyage from the west coast of the United States to a European port or ports which includes intercoastal ports of the United States, or a round voyage from the Atlantic Coast of the United States to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at the State of Hawaii, or an island possession or island territory of the United States, and that if the vessel is operated in the domestic trade on any of the above-enumerated services, he will pay annually to the Secretary of Commerce that proportion of one-twenty-fifth of the construction-differential subsidy paid for such vessel as the gross revenue derived from the domestic trade bears to the gross revenue derived from the entire voyages completed during the preceding year. *The Secretary may consent in writing to the temporary transfer of such vessel to service other than the service covered by such agreement for periods not exceeding six months in any year, whenever the Secretary may determine that such transfer is necessary or appropriate to carry out the purposes of this chapter.* Such consent shall be conditioned upon the agreement by the owner to pay to the Secretary, upon such terms and conditions as he may prescribe, an amount which bears the same proportion to the construction-differential subsidy paid by the Secretary as such temporary period bears to the entire economic life of the vessel. No operating-differential subsidy shall be paid for the operation of such vessel for such temporary period.

(Emphasis added.)

Plaintiffs have argued at substantial length that both the express language of section 506 and the legislative history of both its original 1936 version and its amended 1938 version, as well as the express language of section 501, demonstrate that Congress intended for CDS contracts to be irrevocable and that the *only* means by which ships built with CDS could ever engage in domestic trade is a six-month temporary waiver as expressly provided by section 506. The Court's own review of the pertinent statutory language and legislative history, however, leads the Court to conclude otherwise. While both the statutory language and the legislative history amply support the conclusion that the Secretary's authority with respect to *temporary* waivers of domestic trading restrictions is limited to six-month periods, *nothing* in section 506, in any other provision of Title V, or in the legislative history of these provisions either expressly or implicitly addresses the issue of *permanent* revocation of a CDS contract.

■ In view of this total dearth of guidance from the statutory language and the legislative history, it is necessary for the Court to consider other indicia of legislative intent to determine whether section 506 was intended to preclude the Secretary from permanently waiving domestic trading restrictions in exchange for CDS repayment. As the Court of Appeals for this Circuit recently indicated in a case involving the award of operating-differential subsidies (ODS) under another title of the Merchant Marine Act of 1936, "when there is little guidance to be derived from the language of the statute itself," the reviewing court should consider whether the agency's interpretation of the Act "serves to further the purposes of the legislation in a reasonable and sound manner." *Sea-Land Service, Inc. v. Kreps*, 566 F.2d 763, 778 (D.C.Cir. 1977). In the present case, the Court concludes that, as in the *Sea-Land* case, the Secretary's interpretation of the Act furthers the Act's purposes.

The goals of the Merchant Marine Act of 1936 were described by the *Sea-Land* court as follows:

The Merchant Marine Act of 1936 was enacted to foster the development and continued maintenance of a modern merchant marine fleet for the United States. The Act's declaration of policy states [in 46 U.S.C. § 1101] that

It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency * * *.

To accomplish these goals the Act establishes two subsidies for American shipping enterprises—the operating-differential subsidy . . . and a construction-differential subsidy (CDS) . . . . 566 F.2d 765. There can be no doubt that these statutory purposes are extraordinarily broad, and it would be patently inconsistent with the far-reaching nature of this statutory scheme to interpret the Secretary's authority in an unnecessarily restrictive manner. Plaintiffs' position that the domestic trading restrictions of CDS contracts are *totally irrevocable* precludes any and all administrative flexibility and thereby at least potentially obstructs the Secretary's ability to effectuate the broad statutory goals set forth above. In view of the fact that neither section 506 nor its legislative history indicates that the Secretary's authority should be limited in this manner, the Court concludes that plaintiffs' construction is unreasonably constrictive.

■ As the Supreme Court said in the *Permian Basin Area Rate Cases*, 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1968):

This Court has repeatedly held that the width of administrative authority must be measured in part by the purposes for which it was conferred . . . . Surely the [agency's] broad responsibilities . . . demand a generous construction of its statutory authority.

And, as the Court of Appeals for this Circuit recently held in *Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369, 1381–1382, (1977): "[W]here intent on an issue is unclear, we are instructed to afford the administering agency the flexibility necessary to achieve the general objectives of the Act." For these reasons, the Court concludes that the Secretary's interpretation that she has legal authority under the Act to waive permanently domestic trading restrictions in an appropriate case in exchange for CDS repayment is reasonable and should be upheld.[2]

This conclusion is buttressed by the Comptroller General's 1964 decision with respect to two CDS ships owned by Grace Line, Inc., Decision B–155039, 44 Comp.Gen. 180 (1964), and by the consistent reaffirmation of the validity of this decision by both the Secretary and, on at least one occasion, by Congress. The 1964 *Grace Line* opinion concerned the S.S. SANTA ELIANA and the S.S. SANTA LEONOR, both of which were built under CDS contracts and were therefore subject to the section 506 domestic trading restrictions. Grace Line requested the Secretary to amend the CDS contracts on these ships to remove the domestic trading restrictions in exchange for repayment of CDS so that the vessels could be used in domestic trade. The Secretary concluded that MarAd/MSB had the legal authority to so amend CDS contracts and sought the views of the Comptroller General on this subject. The *Grace Line* opinion manifests the Comptroller General's concurrence in the Secretary's interpretation of MarAd/MSB's authority.

---

**2.** This is not to say that the Secretary's authority to waive permanently domestic trading restrictions in exchange for CDS repayment is unbridled. Rather, it is to say that the appro-priateness of the Secretary's invocation of such authority is best judged on a case-by-case basis. *See* section VI, *infra*.

Since the 1964 *Grace Line* transaction, the Secretary has consistently interpreted section 506 as *not* precluding permanent waiver of domestic trading restrictions in exchange for CDS repayment in the few instances when the issue has arisen. Thus, in 1970, when Seatrain Lines, Inc., the parent of the defendant-intervenors herein, proposed that MarAd/MSB agree, as part of a CDS contract for two vessels other than the STUYVESANT, to permit *"permanent* operation of the vessels in domestic trade upon the repayment of the unamortized portion of CDS," MarAd/MSB's General Counsel reaffirmed the Department's position that the Secretary has the "discretionary authority" in an appropriate case to lift section 506 trading restrictions in exchange for CDS repayment.[3]

MarAd/MSB again reaffirmed this position in 1976. At that time, the Atlas Marine Company and the Aquarius Marine Company requested MarAd/MSB to agree to an amendment of their CDS contracts for the S.S. AMERICAN HERITAGE and the S.S. GOLDEN MONARCH respectively. These vessels were at that time engaged in trade between the mainland United States and the Virgin Islands, which are not considered a domestic port for the purposes of domestic trading restrictions. *See American Maritime Association v. Blumenthal, supra.* MarAd/MSB approved the requested amendments which permit the vessel owners to repay CDS in exchange for the removal of domestic trading restrictions *if* the non-domestic status of the Virgin Islands is changed at some later date. While plaintiffs attempt to downplay the significance of these recent CDS contract amendments because of their conditional nature, there can be no doubt that MarAd/MSB's actions with respect to these contracts were based on a reaffirmation of the Secretary's legal authority to waive trading restrictions in exchange for CDS repayment.

In addition to these administrative reaffirmations of the Secretary's authority, Congress has implicitly affirmed the Secretary's exercise of authority in the *Grace Line* case. In 1972, Congress amended section 1104(a)(3) of Title XI of the Act, 46 U.S.C. § 1274(a)(3), to expand the Secretary's financing authority under Title XI to include loan guarantees for the purpose of financing repayments "in whole or in part" of CDS. This section, when initially introduced, spoke of

> financing, in whole or in part, the repayment to the United States of any amount of construction-differential subsidy paid with respect to a vessel pursuant to Title V of this Act, as amended, in order to release such vessel from all *restrictions* imposed as a result of the payment of construction-differential subsidy, when such repayment is permitted by the Secretary of Commerce after considering the competitive effect of releasing such vessel from such restrictions.

H.R. 9756, 92d Cong., 1st Sess. § 3 (1971). Of course, the financing authority conferred by Title XI is necessarily predicated on the authority of the Secretary to approve the underlying transaction, for otherwise Title XI financing authority would be a useless device. Thus, if Congress had enacted the entirety of the above-quoted language, the second half of which speaks of releasing CDS vessels from *all* restrictions resulting from the payment of CDS, Congress' affirmation of the Secretary's interpretation would have been explicit.

> The consequence of [the] proposal, if accepted, would be to convert a *matter of future exercise of discretionary authority* by the Board into a present right of [the CDS recipient], at its option, to lift the restrictions by CDS repayment.
>
> Such a result is not in keeping with the basic policies of the Act and conflicts with the scope of discretionary authority intended to be vested in the Board.

(Emphasis added.)

---

**3.** Plaintiffs make much of the fact that this legal opinion recommended against approving the repayment proposal. The proposal, however, sought a *pre-contract commitment* from the Secretary to permit CDS buyback "at any time" after contract expiration. The General Counsel considered such a proposal contrary to the purposes of the Act because it would "bind future Boards to exercise a discretionary authority without any regard" to the particular circumstances of a specific application. Thus, the legal opinion concludes:

Congress did not enact this initially-proposed language in its entirety; instead it enacted only the first half of the section as introduced, thereby omitting the explanatory language in the second half. The House report indicates clearly, however, that the reason the Committee on Merchant Marine and Fisheries omitted the explanatory language was *not* to limit the Secretary's Title XI financing authority to one type of CDS repayment arrangement or another, but rather to extend such authority "to all instances of subsidy repayments under Title V." In explaining this action, the Report makes express reference to the *Grace Line* case:

> In the entire history of the administration of the 1936 Act there has been only one instance where a construction-differential subsidy repayment, authorized by the Secretary under very special circumstances, could have called into play the provisions of this paragraph. Your Committee questions the desirability of general legislation to deal with such an unusual situation, and feels that Title XI assistance should be extended to all instances of subsidy repayments under Title V, so as to include the relatively frequent situation of repayments under the first sentence of section 506 of the Act. Your Committee therefore has amended the legislation by deleting the [explanatory] language.

H.R.Rep.No.92–688, 92d Cong., 1st Sess. 10 (1971). There can be no doubt that this explanation evidences the Committee's belief that the 1936 Act authorized the Secretary, *inter alia*, to remove domestic trading restrictions in exchange for CDS repayment, and Congress' enactment of the House Committee's version of section 1104(a)(3) must be deemed as approving the Committee's understanding of the Secretary's authority.

■ In view of the Secretary's consistent and relatively long-standing interpretation of her authority, the Court finds that the present case is an appropriate one in which to defer to the "experience and informed judgment" of the Secretary. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).[4] Such deference is particularly warranted in this case because of Congress' implicit affirmation of the Secretary's interpretation in its enactment of the 1972 amendments to Title XI of the Act. In view of the fact that the Secretary's interpretation is reasonable and seems to further the purposes of the Act, and since deference to this interpretation is warranted in the instant case, the Court holds that section 506 does *not* bar the Secretary from waiving domestic trading restrictions permanently in exchange for repayment of CDS.

In conclusion, therefore, the Secretary has authority to accept repayment of CDS in appropriate circumstances. Since section 506 does *not* preclude the permanent waiver of domestic trading restrictions in exchange for such repayment, the Secretary has authority to waive permanently the section 506 domestic trading restrictions upon the STUYVESANT in exchange for CDS repayment.

## IV. THE ACT DOES NOT PRECLUDE THE SECRETARY FROM ACCEPTING A 20-YEAR PROMISSORY NOTE AS REPAYMENT FOR A CONSTRUCTION – DIFFERENTIAL SUBSIDY.

Plaintiffs' second basis for challenging the Secretary's actions with respect to the CDS repayment for the STUYVESANT is that the form of repayment approved by

---

4. Nothing in this Court's recent opinion in *Investment Annuity, Inc. v. Blumenthal*, 442 F.Supp. 681 (D.D.C.1977), is inconsistent with the conclusion herein that the Secretary's interpretation of her authority in the circumstances of this case is entitled to substantial deference. In *Investment Annuity*, wherein the Court refused to accord substantial deference to the Internal Revenue Service, the Service's interpretation was entirely unprecedented and was in fact inconsistent both with 12 years of consistent treatment by the Service and with a private ruling issued by the Service during the pendency of the litigation. Moreover, the Service's new interpretation was unreasonable and was the product of improper tax reform considerations. Thus, the difference between the two cases could hardly be more pronounced.

the Secretary—a 20-year promissory note—is not equivalent to *full* repayment and that only full repayment will suffice to permit the Secretary to waive permanently domestic trading restrictions. Of course, as the preceding discussion reveals, the Secretary's authority to accept CDS repayment in appropriate cases is not explicit in the Act. As a result, there is naturally neither statutory language nor legislative history to elucidate the scope of the Secretary's authority to structure the form of such repayment transactions.

■■ In view of the Secretary's broad contractual authority which all parties agree extends to appropriate CDS repayment transactions, and the Court's previous conclusion that it would be patently inconsistent with the far-reaching nature of the Act's statutory scheme to interpret the Secretary's authority in an unnecessarily restrictive manner, the Court finds that it would be entirely inappropriate at this stage of the litigation for the Court to accept plaintiffs' contention that no form of promissory note can legally be accepted by the Secretary as repayment for CDS. The Court concurs in defendant-intervenors' assessment that the determination of the legality of a given method of payment is most appropriately left to the discretion of the Secretary with judicial interference restricted to review of individual determinations to ensure that the requirements of the Administrative Procedure Act (APA) are satisfied. Accordingly, the Court concludes that CDS repayment by means of a promissory note is not precluded by the Act.

## V. PLAINTIFFS' HAVE BEEN DEPRIVED OF NO PROPERTY INTEREST COGNIZABLE UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT, AND THEY ARE THEREFORE ENTITLED TO NO RELIEF UPON THEIR CONSTITUTIONAL CLAIM.

The third ground upon which plaintiffs challenge the defendants' actions with respect to the STUYVESANT is the Due Process Clause of the fifth amendment.

Plaintiffs assert that this clause requires the Secretary to afford plaintiffs and other interested parties an adequate opportunity to present their views before approving the waiver of domestic trading restrictions. They contend that the Secretary therefore denied them due process of law by not giving them adequate notice of Polk's August 25, 1977 application for total CDS repayment and permanent waiver of domestic trading restrictions.

■ Notwithstanding the alleged "lack of process" in the Secretary's decision-making with respect to the STUYVESANT, it is clear that plaintiffs' rights under the Due Process Clause were not abridged. The Due Process Clause is not a panacea for all instances where an agency of the federal government fails to act pursuant to appropriate procedures. Rather, as the Court of Appeals for this Circuit recently held:

Only if the Court first finds that a "liberty" or "property" interest is affected will it go on to a balancing of interests analysis to determine what level of procedural protection is appropriate. *E. g., Fusari v. Steinberg*, 419 U.S. 379, 389, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975); *Board of Regents v. Roth*, [408 U.S. 564, 570–71 & n.8, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)]; *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

*Mazaleski v. Treusdell*, 562 F.2d 701, 709 (D.C.Cir.1977). *Accord, Colm v. Vance*, 567 F.2d 1125 (D.C.Cir. Nov. 18, 1977).

■ In the instant case, plaintiffs have no "property interest" in the STUYVESANT transaction within the meaning of the Due Process Clause. Plaintiffs have alleged that the Secretary's actions deprived them of a "business opportunity," denied them their statutory right to be free from the unfair competition of CDS-vessels, and indirectly caused their vessels to decrease in value because the result of the Secretary's actions is to increase the supply of ships qualified to engage in domestic trade. Plaintiffs have cited absolutely no applicable precedents for characterizing these injuries as deprivations of "property interests." Plaintiffs have no "legitimate claim of en-

titlement" to be free from competition. *Cf. Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Accordingly, the Court concludes that plaintiffs have not been deprived of any property interests cognizable under the Due Process Clause. If they are entitled to any relief as a result of the alleged "lack of process" in the Secretary's decision-making with respect to the STUYVESANT, such relief must be derived from the Administrative Procedure Act (APA) or some other federal statute.

## VI. THE SECRETARY FAILED TO GIVE FULL AND PROPER CONSIDERATION TO THE COMPETITIVE EFFECTS OF HER DECISIONS TO ACCEPT CDS REPAYMENT BY WAY OF A 20–YEAR PROMISSORY NOTE AND TO WAIVE PERMANENTLY DOMESTIC TRADING RESTRICTIONS UPON THE STUYVESANT, AND HER DECISION WAS, THEREFORE, ARBITRARY AND CAPRICIOUS AND AN ABUSE OF DISCRETION.

Having determined that the Secretary has general authority to accept CDS repayment and to waive permanently domestic trading restrictions in exchange for such repayment, that the Act does not proscribe the acceptance of a promissory note as repayment for CDS, and that plaintiffs have no property interest in the STUYVESANT transaction cognizable under the Due Process Clause, it becomes necessary to consider plaintiffs' final contention that the Secretary's actions with respect to the STUYVESANT are violative of the APA. Plaintiffs assert three claims in support of this contention. First, they argue that the defendants acted in violation of 5 U.S.C. § 552(a)(1), as interpreted by the Supreme Court in *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), by failing to promulgate "substantive rules of general applicability," 5 U.S.C. § 552(a)(1)(D), prior to acting in the instant case. Second, they claim that the Secretary's actions were arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. § 706(2)(A) in

that the "operative decision" to waive domestic trading restrictions on the STUYVESANT was made without notice sometime in 1975 and kept secret until August 1977. Finally, they claim that the Secretary's decisions to waive domestic trading restrictions and to accept a 20-year promissory note as CDS repayment were arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. § 706(2)(A) because these decisions were made without full and proper consideration of relevant factors. For the reasons hereinafter stated, the Court concludes that plaintiffs are entitled to partial summary judgment on their third APA claim, that defendants and defendant-intervenors are entitled to summary judgment on plaintiffs' first APA claim and, finally, that material facts in dispute preclude resolution of plaintiffs' second APA claim.

Plaintiffs' first APA claim—that defendants violated 5 U.S.C. § 552(a)(1)—is based on the 1974 decision by the Supreme Court in *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270. In that case, the Court employed some extraordinarily far-reaching language in holding that the Bureau of Indian Affairs of the Department of the Interior had failed to comply with the APA in developing eligibility requirements for welfare benefits. Thus, the Court said:

> The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. . . . No matter how rational or consistent with congressional intent a particular decision might be, the determination of eligibility cannot be made on an *ad hoc* basis by the dispenser of funds.
>
> The Administrative Procedure Act was adopted to provide, *inter alia*, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary na-

ture of unpublished *ad hoc* determinations.

415 U.S. at 232–33, 94 S.Ct. at 1072–73.

■ Notwithstanding this sweeping language, it appears to the Court that section 552(a)(1) does not compel the Secretary to promulgate regulations to govern *all* aspects of her general contractual authority. Although *Ruiz* might suggest otherwise, it appears that neither the Supreme Court nor the lower courts have interpreted *Ruiz* in such an expansive manner. *See* K. Davis, *Administrative Law of the Seventies* § 6.13–1 (1976) ("Altogether, the *Ruiz* opinion does not seem to be a reliable guide as to present or future law." (at 240)). A careful reading of section 552(a)(1) and particularly subsection (D) indicates that, rather than requiring the promulgation of substantive regulations as plaintiffs contend, this section requires the *publication* of such rules and interpretations "of general applicability" that are in fact "formulated and adopted by the agency." Accordingly, the Court concludes that the APA does not *require* the Secretary to promulgate regulations prior to exercising her general contractual authority to accept CDS repayment and to waive permanently domestic trading restrictions.

Nevertheless, as the Court indicated at the most recent hearing in this case, the Court firmly believes that whether or not the strict mandate of Congress requires the promulgation of regulations, the Secretary should, as a matter of sound policy, establish guidelines and procedures of general applicability to govern CDS repayment and permanent waivers of domestic trading restrictions. The Court is unpersuaded that there is any compelling reason for the Secretary to make determinations on applications such as that concerning the STUYVESANT on an *ad hoc* basis. Substantive guidelines and procedural requirements for applications should be established so that all members of the industry stand on equal footing before the Secretary, and these procedures should guarantee interested competitors and members of the public the opportunity to be heard. *Cf. Joseph v. United States Civil Service Commission*, 180 U.S. App.D.C. 281, 293, 554 F.2d 1142, 1154 n.26 (1977). As the Court of Appeals for this Circuit stated in a related maritime-subsidy context:

> [S]ince Congress has delegated the authority to the Secretary to pass upon applications for contracts of government subsidy, and since these grants are part of the government wealth, it is incumbent upon the Secretary to follow sound administrative procedures to determine the necessity of expenditures and thereby serve the master, public interest.

*Sea-Land Service, Inc. v. Connor*, 135 U.S. App.D.C. 306, 313, 418 F.2d 1142, 1149 (1969). The Court is confident that the Secretary will give these concerns regarding the need for appropriate regulations her most serious consideration.

■ Plaintiffs' second APA claim is that the Secretary's actions were arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. § 706(2)(A) in that the "operative decision" to accept CDS repayment and to waive permanently domestic trading restrictions on the STUYVESANT was made without notice in 1975 and kept secret until August 1977. It appears to the Court, however, that material facts remain in dispute with respect to plaintiffs' allegations concerning the pre-1977 actions of the Secretary. It further appears to the Court that additional discovery should be permitted prior to resolution of this APA argument. Accordingly, the Court will at this time deny those portions of defendants' and defendant-intervenors' motions that seek summary judgment on this second APA claim.[5]

■ Plaintiffs' final APA claim is that the Secretary's actions were arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. § 706(2)(A) in that she failed to give full and proper consideration

---

**5.** Plaintiffs have not moved for summary judgment on this claim because of their alleged need for further discovery.

to relevant factors prior to rendering her decisions with respect to the STUYVESANT. It is a well-established tenet of administrative law that an essential function of judicial review is to ensure that the agency decision was based on a consideration of the "relevant factors." *See, e. g., Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 417, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *American Paper Institute v. Train,* 177 U.S.App.D.C. 181, 191, 543 F.2d 328, 338 (1976); *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 408, 541 F.2d 1, 34, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Failure of an agency to consider such relevant factors, or failure to accord such factors appropriate weight, renders the agency's decision arbitrary and capricious. *Id.* In making this determination, the focal point of the Court's scrutiny must be the "full administrative record that was before the Secretary at the time [she] made [her] decision." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 421, 91 S.Ct. at 825. *See Doraiswamy v. Secretary of Labor,* 180 U.S.App.D.C. 360, 369–370, 555 F.2d 832, 841–42 (1976).

Defendants in the present case submitted to the Court on October 28, 1977, two certified administrative records. The first of these deals with the Secretary's decision to accept repayment of CDS and to waive permanently domestic trading restrictions in exchange therefor. The second concerns the Secretary's decision to approve the sale of the STUYVESANT and the related financial transactions that were closed on September 30, 1977. The Court has carefully scrutinized both records. This scrutiny reveals that the Secretary gave serious consideration to the following factors: (1) the lack of viable employment opportunities for the STUYVESANT other than in the Alaska oil trade; (2) the improvement of the Government's collateral position and the prevention of possible defaults on other outstanding obligations; and (3) the continued viability of Seatrain Shipbuilding. This scrutiny also reveals, however, that the Secretary failed to consider the effect of her decisions with respect to the STUYVESANT upon competition in the domestic

transportation of Alaskan oil. It thus becomes necessary to determine whether "competitive effect" is a "relevant factor" such that the Secretary's failure to consider such effect renders her decision arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. § 706(2)(A).

Of course, since the Act contains no express authority for permanent waivers of domestic trading restrictions, there are no specific statutory factors which the Secretary must consider in determining whether to accept CDS repayment in exchange for such waivers. Similarly, the Act provides no express guidance as to what factors should be considered by the Secretary in structuring the form of such repayment. Moreover, the Secretary has promulgated no guidelines of her own to govern decisions of these types. This is not to say, however, that the Secretary's authority in these matters is unrestricted. The absence of express legislative authority to waive permanently domestic trading restrictions should not effectively insulate the Secretary from judicial review. Rather, in the absence of express statutory and regulatory guidelines, the Court must look to the purposes of the Act to ascertain what factors the Secretary should consider in her decision-making. *Cf. Sea-Land Service, Inc. v. Kreps, supra.*

■ Analysis of the Act and its legislative history indicates clearly that the protection of unsubsidized vessels from the "unfair" competition of subsidized vessels is one of the cornerstones of the statutory scheme. The most compelling evidence of the importance of this statutory purpose is section 506 itself, which, as previously demonstrated, *requires* CDS recipients to agree to domestic trading restrictions. As both the 1936 and 1938 legislative histories reveal, an overriding concern of Congress in replacing the pre-existing mail subsidy program with the CDS and ODS programs of the 1936 Act was to insulate unsubsidized domestic vessels from the debilitating effect of subsidized competition. Thus, the *pro rata* payback for the six-month waivers expressly authorized by section 506 was specifically intended to ensure that subsidized

vessels would at no time possess an unfair cost advantage over unsubsidized vessels. The importance of the competitive effect of trading restriction waivers is further underscored by MarAd's recently promulgated regulations governing temporary section 506 waivers for the carriage of Alaskan oil between Alaska and the Panama Canal. These regulations, 46 C.F.R. §§ 250.1–250.6, 42 Fed.Reg. 33,035–36 (June 29, 1977), specifically require the Assistant Secretary of Commerce for Maritime Affairs to publish notice of all temporary waiver applications for the carriage of Alaskan oil and further require him to give consideration to written protests filed by competitors. 46 C.F.R. § 250.4. There can be no doubt that this second requirement evidences that the Secretary herself recognizes the importance of considering the competitive effect of waivers of section 506 domestic trading restrictions.[6]

These indications of statutory purpose lead the Court to conclude that competitive effect is not only a "relevant factor," but is in fact an essential factor to be considered before decisions with respect to trading restriction waivers are made. Thus, before approving the permanent waiver of domestic trading restrictions upon the STUYVESANT, the Secretary should have given full consideration to (1) the effect upon competition of permitting the STUYVESANT to engage in the Alaskan oil trade, and (2) the effect upon competition of permitting Polk to repay the STUYVESANT's CDS with a 20-year promissory note rather than requiring immediate payment in full and/or requiring payment of an interest assessment for the period since the CDS had been paid to Seatrain Shipbuilding. The Secretary's failure to give full consideration to these effects must be deemed to render her decisions with respect to the STUYVESANT arbitrary, capricious, and an abuse of discretion and, therefore, violative of 5 U.S.C. § 706(2)(A).

Accordingly, the Court will grant plaintiffs' summary judgment in part insofar as their motions seek relief for the Secretary's failure to give appropriate consideration to relevant factors in her decision-making with respect to the STUYVESANT. The Court will therefore remand the case to the Secretary in order to permit her to consider the protests of plaintiffs and other interested parties and to give appropriate weight to competitive effect in her ultimate decision with respect to the STUYVESANT. Because of the necessity of an expeditious final resolution of this controversy, the Court will order defendants to complete such further consideration within 45 days from the date of this Memorandum Opinion and accompanying Order.

## VII. CONCLUSION

The Court concludes that the Secretary of Commerce has authority under the Merchant Marine Act of 1936 to waive permanently domestic trading restrictions on a vessel built with construction-differential subsidy in exchange for repayment of such subsidy and that the Secretary further has authority to accept a 20-year promissory note as such repayment. The Court also concludes that plaintiffs have no property interest in the STUYVESANT transactions which is cognizable under the Due Process Clause of the fifth amendment. In addition, the Court concludes that defendants are not required by 5 U.S.C. § 552(a)(1) to promulgate "substantive rules of general applicability" to govern CDS payback and permanent trading restriction waivers. Accordingly, the Court will grant defendants' and defendant-intervenors' motions for summary judgment with respect to those portions of the complaints herein that seek relief based on the aforestated arguments.

The Court concludes, however, that plaintiffs are entitled to partial summary judgment with respect to their claim that the Secretary's decisions concerning the STUY-

**6.** Further evidence of the Secretary's recognition of the importance of competitive effect is that she excluded from the waiver regulations those segments of the Alaskan oil trade—Alas-

ka-West Coast and Panama Canal-Atlantic/Gulf Coast—for which "suitable tank vessels built without CDS appear to be available." 42 Fed.Reg. at 33,035.

**1144**

VESANT were arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. § 706(2)(A) because she failed to consider the competitive effects of her decisions. Accordingly, the Court will remand this case to the Secretary for her immediate consideration.

Finally, the Court concludes that plaintiffs' remaining claim that the Secretary's decisions with respect to the STUYVESANT were arbitrary, capricious, and an abuse of discretion because they were made without notice in 1975 and kept secret until August 1977 cannot be resolved on the pending motions because material facts relating to this claim remain in dispute. Accordingly, the Court will deny defendants' and defendant-intervenors' motions for summary judgment insofar as they relate to this claim, and this claim will remain before the Court to permit further discovery.

An Order in accordance with the foregoing will be issued of even date herewith.