SEATRAIN SHIPBUILDING CORP. ET AL. *v.* SHELL OIL
CO. ET AL.

No. 78–1651.   Argued November 28, 1979—Decided February 20, 1980

BRENNAN, J., delivered the opinion for a unanimous Court.

*William E. McDaniels* argued the cause for petitioners. With him on the briefs were *John W. Vardaman, Jr., Neal M. Mayer,* and *Jonathan Blank.*

*Andrew J. Levander* argued the cause *pro hac vice* for the federal parties as respondents under this Court's Rule 21 (4) in support of petitioners. With him on the briefs were *Solicitor General McCree, Acting Assistant Attorney General Daniel, Ronald R. Glancz, Michael Kimmel,* and *Michael J. McMorrow.*

*Amy Loeserman Klein* and *Stephen N. Shulman* argued the cause for respondents. With Ms. Klein on the brief for respondents Alaska Bulk Carriers, Inc., et al. were *William Karas, Francis Ballard,* and *Alan G. Choate.* With Mr. Shulman on the brief for respondent Shell Oil Co. were *Joseph A. Artabane* and *Mark C. Ellenberg.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In 1972, petitioner Seatrain Shipbuilding Corp. (Seatrain) received a construction-differential subsidy (CDS) of $27.2

million pursuant to Title V of the Merchant Marine Act, 1936, 49 Stat. 1995, as amended, 46 U. S. C. § 1151 *et seq.,* to construct the 225,000-deadweight-ton supertanker *Stuyvesant.* As required by § 506 of the Act, 46 U. S. C. § 1156, Seatrain and its affiliate, petitioner Polk Tanker Corp., the initial owner of the *Stuyvesant,* agreed to operate the supertanker exclusively in the foreign trade except as otherwise authorized in that section. By the time the vessel was completed in 1977, however, petitioners wanted to operate it in the domestic trade. Accordingly, they asked the Secretary of Commerce permanently to lift all restrictions on the *Stuyvesant's* operation in domestic commerce in exchange for their fully secured, 20-year interest-bearing note repaying in full the vessel's CDS. The Secretary granted the application, accepted the promissory note, and deleted the applicable restrictions from the CDS contract. The primary question for decision is whether the Secretary of Commerce may terminate the restrictions imposed pursuant to § 506 when the owners of a vessel constructed with a CDS repay that subsidy in full. The District Court for the District of Columbia concluded that the Secretary had such authority, *Shell Oil Co.* v. *Kreps,* 445 F. Supp. 1128 (1977). The Court of Appeals for the District of Columbia Circuit disagreed and reversed. *Alaska Bulk Carriers, Inc.* v. *Kreps,* 194 U. S. App. D. C. 7, 595 F. 2d 814 (1979). We granted certiorari. 442 U. S. 940 (1979). We reverse.

I

The costs of constructing ships in American shipyards and manning them with American crews are higher than comparable costs in foreign ports. Accordingly, Congress has taken a number of steps to protect and support the United States' shipping and shipbuilding industries. The Jones Act, 46 U. S. C. § 883, has, since 1920, reserved the United States domestic trade exclusively for vessels built in this country and

owned by its citizens.[1] The Merchant Marine Act, 1936, 46 U. S. C. § 1101 *et seq.*, established a number of programs to help American vessels compete effectively in foreign trade with vessels constructed and staffed abroad. Specifically, Title V of that Act, 46 U. S. C. § 1151 *et seq.*, authorizes the Secretary of Commerce to grant a CDS for up to 50% of the cost of constructing a ship in this country. The owners of vessels built with these subsidies are required by § 506, 46 U. S. C. § 1156,[2] to agree that they will operate only in for-

---

[1] Some form of prohibition on use of foreign vessels in domestic trade predates the Jones Act by more than a century. See, *e. g.*, Act of Mar. 1, 1817, 3 Stat. 351. See generally G. Gilmore & C. Black, The Law of Admiralty 963, and nn. 34 and 35 (2d ed. 1975).

[2] Section 506 of the Act, 49 Stat. 1999, as amended, 46 U. S. C. § 1156, provides as follows:

"Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade, or on a round-the-world voyage, or on a round voyage from the west coast of the United States to a European port or ports which includes intercoastal ports of the United States, or a round voyage from the Atlantic coast of the United States to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at the State of Hawaii, or an island possession or island territory of the United States, and that if the vessel is operated in the domestic trade on any of the above-enumerated services, he will pay annually to the Secretary of Commerce that proportion of one-twenty-fifth of the construction-differential subsidy paid for such vessel as the gross revenue derived from the domestic trade bears to the gross revenue derived from the entire voyages completed during the preceding year. The Secretary may consent in writing to the temporary transfer of such vessel to service other than the service covered by such agreement for periods not exceeding six months in any year, whenever the Secretary may determine that such transfer is necessary or appropriate to carry out the purposes of this chapter. Such consent shall be conditioned upon the agreement by the owner to pay to the Secretary, upon such terms and conditions as he may prescribe, an amount which bears the same proportion to the construction-differential subsidy paid by the Secretary as such temporary period bears to the entire economic life of the vessel. No operating-differential subsidy shall be paid for the operation of such vessel for such temporary period."

eign trade unless they come within one of two explicit statutory exceptions. Neither exception may be invoked unless the owner remits to the Government an appropriate pro rata portion of the outstanding subsidy.

In 1969, petitioner Seatrain began constructing a series of supertankers at the former Brooklyn Navy Yard. The venture received substantial amounts of federal aid. By its completion, the Economic Development Administration (EDA) of the Department of Commerce had advanced $5 million as a direct loan and had guaranteed 90% of $82 million in loans from other sources to help finance modernization and operation of the Navy Yard facilities and a major on-the-job training program.[3] Moreover, the Department granted a CDS for each of the four supertankers built by Seatrain,[4] in addition to guaranteeing various construction loans.

The *Stuyvesant* was the third of the Seatrain tankers.[5] In the mid-1970's, while it was under construction, demand for such vessels began to decline in the wake of the Arab oil embargo, increasing crude oil prices and the economic problems that ensued.[6] By 1977, when the vessel was completed,

---

[3] Seatrain also invested some $38 million of its own funds in the project.

[4] The first two tankers, the *Brooklyn* and the *Williamsburg,* initially found employment in the foreign trade and subsequently were placed in layup. App. 112. The decision in this case may have some bearing on the fate of the fourth, the *Bay Ridge.* See *infra,* at 580–582.

[5] In addition to the $27.2 million CDS, loans of $30.2 million were guaranteed under Title XI of the Act, 46 U. S. C. § 1271 *et seq.,* for construction of the *Stuyvesant.* Similar financial support was made available for the *Bay Ridge,* which received a CDS of $28.8 million and Title XI loan guarantees of $34.5 million.

[6] This drop in tanker demand had caused Seatrain to halt construction of both the *Stuyvesant* and the *Bay Ridge* in early 1975—a halt that necessitated the layoff of most of the shipyard's 2,500 employees and virtually shut the facility down. The yard reopened and construction resumed only after the EDA provided 90% guarantees for additional bank loans of $40 million. From that time on Seatrain apparently was on the lookout for prospects for employing the two supertankers in the domestic trade.

there was a significant oversupply of tankers on the world market and no opportunity in foreign trade for the fledgling *Stuyvesant*. Foreseeing this problem, the owners had begun to explore prospects for employing the vessel in the transportation of Alaskan crude from Valdez around Cape Horn to the Eastern United States and the Caribbean. This relatively new trade required sizeable tankers, and since the Jones Act restricted it to American-flag vessels [7] the demand remained high despite the abundance of otherwise suitable foreign vessels.

In mid-1977, petitioner Polk Tanker Corp. executed an agreement with Standard Oil of Ohio (SOHIO) for a 3-year charter of the *Stuyvesant* for use in the Alaskan trade. The agreement was conditioned upon Polk's obtaining from the Secretary of Commerce a release from the foreign-trade-only restriction imposed pursuant to § 506. This was obtained at the end of August [8] in the form of letters to Polk and Queensway Tankers, Inc., the proposed operator of the vessel. Those letters recited the findings upon which the agency based its decision. These were: (1) that there were no other opportunities for employment of the *Stuyvesant*, (2) that the SOHIO charter would strengthen the collateral securing obligations the Government had guaranteed, (3) that the charter might prevent default on those obligations, and (4) that failure to approve the proposal would jeopardize the continued operation of Seatrain.[9]

The complex closing of several transactions necessary to finance repayment of the CDS, refinance various other obligations, and transfer the *Stuyvesant* to new owners and operators

---

[7] See 46 U. S. C. § 883; n. 1, *supra*.

[8] The preceding month, Polk had sought permission to operate the *Stuyvesant* in coastal trade for three years in exchange for pro rata repayment of the CDS. This application was withdrawn in the face of strong protests from prospective competitors.

[9] Letter of James S. Dawson, Jr., Secretary of Maritime Administration, to Polk Tanker Corp., Aug. 31, 1977, App. 530.

was scheduled for September 23, 1977. On September 22, respondents, three competitors in the Alaskan trade, brought suit in the District Court for the District of Columbia against various Department of Commerce officials. The complaints sought declaratory and injunctive relief prohibiting the Secretary from granting a permanent release from the § 506 foreign-trade-only requirement.[10] They argued (1) that the Secretary lacked authority to grant such a release and (2) that, even if the Secretary had authority to do so in certain cases, that authority should not have been exercised with regard to the *Stuyvesant*. In addition, they alleged violations of various procedural requirements of the Administrative Procedure Act and asserted that the Secretary was without power to accept a promissory note as repayment for the CDS. Petitioners Seatrain and Polk were permitted to intervene as defendants.

On November 22, 1977, ruling on the parties' cross-motions for summary judgment, the District Court held (1) that the Secretary had the authority to release vessels from trade restrictions imposed pursuant to § 506 in exchange for full CDS repayment and could accept a promissory note, (2) that releasing the *Stuyvesant* from such restrictions without analyzing the economic effect of that vessel's entry into the Alaskan trade was an abuse of discretion, and (3) that there existed material issues of fact which made summary judgment on portions of the Administrative Procedure Act claim improper. The court remanded the case to the Secretary for consideration of the competitive consequences of the *Stuyvesant* decision.[11] Eight days later, on the motion of the respondents,

---

[10] Two separate complaints were filed, one by Alaska Bulk Carriers, Inc., and Trinidad Corp., and the other by Shell Oil Co. They were consolidated before the District Court.

[11] The remand proceedings were completed on January 6, 1978, prior to oral argument in the Court of Appeals. The Secretary concluded that there would continue to be a shortage of tankers in the Alaskan trade for the foreseeable future and that the entry of the *Stuyvesant* into that trade

the court amended its decision by dismissing the Administrative Procedure Act claim and—relying on Rule 54 (b) of the Federal Rules of Civil Procedure—certifying its decision as a "final judgment." [12]

Respondents appealed from this certified final judgment, and a divided panel of the Court of Appeals reversed, concluding that by specifying two exceptions to the foreign-trade-only requirement § 506 occupied the field and impliedly prohibited the Secretary from making any other exceptions under the Act's more general provisions. 194 U. S. App. D. C., at 15–22, 595 F. 2d, at 822–829. Judge Bazelon dissented, *id.*, at 33, 595 F. 2d, at 840, stating that he would hold that § 506 did not limit the Secretary's power in this regard. He observed that after full repayment of the CDS and appropriate interest the *Stuyvesant* would be on precisely the same footing as other vessels in the unsubsidized domestic fleet.

## II

We are met at the outset with the contention that we lack jurisdiction to hear this case. Raised for the first time in a footnote to the federal parties' petition for rehearing in the Court of Appeals, the argument is that the District Court's November 30 judgment and order was not a "final decision" for purposes of 28 U. S. C. § 1291 because it remanded the case to the Secretary for consideration of the economic consequences of permitting the *Stuyvesant* to enter the Alaskan oil trade.[13] Respondents, the federal parties assert, sought but one form of relief—an order barring the *Stuyvesant* from competing with their own vessels. They advanced two

would accordingly have little or no adverse effect on the respondents. *Id.*, at 568–569. Thereafter, Shell filed suit in the District Court challenging these findings. Its complaint was dismissed without prejudice following the decision of the Court of Appeals in the present case.

[12] *Id.*, at 558–559.

[13] Title 28 U. S. C. § 1291 states that "[t]he courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States. . . ."

legal theories to support that prayer, one general—that the Secretary has no power to grant a permanent release from restrictions imposed pursuant to § 506—and the other particular—that even if the Secretary has the power to do so in some circumstances, the exercise of that power with regard to the *Stuyvesant* was an abuse of discretion. On remand, the federal parties continue, the Secretary might have concluded that the termination of § 506 restrictions was unwise. Alternatively, the Secretary might have decided to adhere to the original administrative decision and then been reversed by the courts. In either case, the federal parties argue, respondents would have obtained all the relief they sought. Accordingly, the District Court's November 30 order did not " 'en[d] the litigation on the merits and leav[e] nothing for the court to do but execute the judgment,' " *Coopers & Lybrand* v. *Livesay,* 437 U. S. 463, 467 (1978), quoting from *Catlin* v. *United States,* 324 U. S. 229, 233 (1945), and thus was not a "final decision." As a result, the argument concludes, the November 30, 1977, order was not appealable to the Court of Appeals and this Court is therefore without jurisdiction to hear the case.

The difficulty with the federal parties' argument is that it misapprehends the nature of at least one of the complaints which commenced this litigation—that of Alaska Bulk Carriers, Inc., and Trinidad Corp.[14] Fairly read, that complaint seeks not only relief from competition from the *Stuyvesant,* but also a general declaration that the Secretary of Commerce is without power to permit *any* vessel constructed with the assistance of a CDS to enter the domestic trade under *any* circumstances save those narrow exceptions specifically mentioned in the statute itself. In this regard, the complaint alleged that the Secretary would in the future grant a *Stuyvesant*-like waiver to that vessel's sister ship, the *Bay Ridge.*[15] It stated that the

---

[14] The Alaska Bulk Carriers complaint is reproduced at App. 45–63.

[15] Complaint ¶¶ 33 and 42, App. 57, 61–62.

owners of unsubsidized vessels would be harmed by competition from the *Stuyvesant* "and from other CDS-built vessels with respect to which . . . the agency may likewise lift operating restrictions if this action is permitted to stand." [16] And its prayer for relief sought (1) declaratory and injunctive relief relating to the *Stuyvesant* itself, (2) a declaration that the Secretary lacks authority permanently to waive § 506 restrictions under any circumstances, (3) an injunction barring the Secretary from amending CDS contracts or taking any other action to lift § 506 restrictions, and (4) such other relief as the court deemed necessary.[17] There were, in short, two claims made and two quite different sorts of relief sought.[18]

In their reply brief, the federal parties attempt to answer the contention that respondents made two separate claims for relief by asserting that as to one of them—the request for a determination that the Secretary lacked power to grant a permanent release—the case-or-controversy requirement of Art. III of the Constitution has not been satisfied. Terming the question "abstract" and "hypothetical," the federal parties maintain that this claim was in effect a request for an advisory

---

[16] *Id.,* ¶ 41, App. 61.

[17] *Id.,* at 62–63. The Shell complaint is reproduced *id.,* at 6–17. It focuses far more specifically on the *Stuyvesant,* and were it the only complaint before us there might be more force to the federal parties' characterization of this litigation as presenting a single claim supported by two theories. In that event, we would have had to explore some of the alternative bases of jurisdiction advanced by the respondents. The clear presence of two claims in the Alaska Bulk Carriers complaint makes such an inquiry unnecessary.

[18] The two are not, of course, unrelated. In particular, a favorable disposition of respondents' statutory claim would leave respondents with no reason to press the administrative one. The contrary proposition, however, is not true. The complaint strongly suggests that respondents would have pressed for resolution of their statutory claim even if the Secretary or the courts had concluded that under the circumstances existing at the time the administrative determination was made the *Stuyvesant* could not lawfully have been permitted to enter the Alaskan trade.

opinion, that it could not stand alone. We disagree. In our judgment, respondents' claim that the Merchant Marine Act does not permit the Secretary to grant a permanent release from § 506 restrictions satisfies the case-or-controversy requirement quite apart from the fate of the particular decision with respect to the *Stuyvesant*. First, there is at least one other vessel on the horizon as to which a similar waiver may well be sought and granted—the *Bay Ridge*. Built in the same yard for the same purpose, faced with a similar plight, and likely to have a similar effect on the Alaskan market if the same solution to that plight is sought, the *Bay Ridge* is a prime candidate for release from § 506 restrictions, and the prospect of its release is sufficient to create a live controversy. In this respect, the present case is very different from *Golden* v. *Zwickler*, 394 U. S. 103, 106–107, 109–110 (1969), on which the federal parties rely. Second, the Secretary's decision to grant a full release for the *Stuyvesant* is clear evidence of administrative willingness to grant such releases in appropriate cases if they are in fact lawful. Accordingly, there is nothing speculative about the assertion that, unless restrained or at least given the benefit of an authoritative ruling of law by this Court, the agency will grant such waivers in the future.[19] Compare *Steffel* v. *Thompson*, 415 U. S. 452, 459 (1974), and *id.*, at 476 (concurring opinion), with *O'Shea* v. *Littleton*, 414 U. S. 488, 493–498 (1974).[20] And third, the *Stuyvesant* itself contributes to the concrete controversy between respondents and the agency. As a practical matter, whether that vessel operates in the Alaskan trade is likely to depend almost entirely on the outcome of this litigation. And even were it determined on review of the remand decision that under the circumstances existing at the time a waiver was improper, both the *Stuyvesant* and the *Bay Ridge* would remain in the wings

---

[19] Prior administrative practice supports this conclusion as well. See *infra*, at 595.

[20] See also *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 152–154 (1967).

as likely prospects for future waivers if circumstances were to change. Accordingly, we conclude that the respondents' claim for relief respecting the general powers of the Secretary meets the case-or-controversy requirement of Art. III.

Having determined that there were two separate claims, each within the jurisdiction of the courts below, we need only note that the appeal from the District Court decision comported fully with Rule 54 (b) of the Federal Rules of Civil Procedure.[21] That Rule states in relevant part that "[w]hen more than one claim for relief is presented in an action . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims . . . only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." In the present case, more than one claim for relief was presented and the District Court found there was no reason for delay prior to directing the entry of final judgment as to one of the claims.[22] As a result, the determination that the Secretary was empowered to waive permanently the re-

---

[21] We recognize that the District Court could not by purporting to comply with Rule 54 (b) render final for purposes of 28 U. S. C. § 1291 a decision that was in fact not final. *Liberty Mutual Ins. Co.* v. *Wetzel*, 424 U. S. 737, 742–743 (1976); *Sears, Roebuck & Co.* v. *Mackey*, 351 U. S. 427, 435 (1956). These cases make clear that Rule 54 (b) may properly be applied only to actions in which there has been a final decision on one or more but fewer than all the multiple claims raised. This condition is fully satisfied here, and the federal parties' reliance on *Liberty Mutual* is thus misplaced. There the District Court had made a determination of liability but had finally disposed of none of the original plaintiff's prayers for relief. Accordingly, Rule 54 (b) was not applicable. Here, one of the respondents' claims for relief was actually decided against them.

[22] App. 558–559. All parties proceeded as though the November 30 order were final. Indeed, even the federal parties initially appealed from that judgment, although that appeal was later dismissed on the federal parties' motion. Brief for Respondents Alaska Bulk Carriers, Inc., et al. 36, n. 26.

strictions required by § 506 was a final decision certifiable under Rule 54 (b) and appealable under 28 U. S. C. § 1291.

### III

Prior to 1936, Congress assisted the American maritime industry in two ways: (1) it provided substantial low-interest loans to aid the construction of vessels destined for foreign trade, and (2) it appropriated large amounts of money for oceangoing mail contracts—amounts considerably in excess of actual cost and clearly intended as a subsidy for American shipping.[23] Neither effort was very successful. Loan repayment was difficult to secure, few ships were constructed, and the hidden mail subsidy proved unwieldy in addition to being somewhat disingenuous.[24]

In 1935, President Roosevelt proposed that Congress end the subterfuge and adopt a forthright and sensibly tailored program to subsidize and stimulate American shipping and shipbuilding. The result was the Merchant Marine Act, 1936. Its basic goals were set forth in § 101, 46 U. S. C. § 1101. There Congress declared it to be the policy of the United States "to foster the development and encourage the maintenance" of a large and effective merchant marine capable of meeting the Nation's future commercial and military needs. The fleet was to be modern and efficient. And Congress intended that it be supported by substantial shipbuilding and repair facilities.[25]

---

[23] See H. R. Doc. No. 118, 74th Cong., 1st Sess., 1–3 (1935) (message from the President). In addition to these measures aimed at making it possible for American vessels to compete in foreign trade, of course, the Jones Act, 46 U. S. C. § 883, reserved the domestic trade for American vessels. See *supra*, at 574–575, and n. 1.

[24] H. R. Doc. No. 118, *supra*, at 3–19 (Report of the Postmaster General).

[25] Section 101, 49 Stat. 1985, as amended, provides in full as follows:

"It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine

The Secretary of Commerce was given broad authority to oversee administration of the Act. Thus, he was called upon to undertake a survey of the merchant marine, to note its needs, and to adopt a long-range program for meeting those needs. § 210, 46 U. S. C. § 1120. He was directed to investigate and keep current records of essential routes and lines to foreign ports, bulk-cargo carrying service requirements, needs for various types of vessels in various routes, construction and operating costs here and abroad, shipyard conditions, and new designs and technologies. § 211, 46 U. S. C. § 1121. He was authorized to devise means of encouraging use of American-flag vessels and improving those vessels in collaboration with vessel owners and shipbuilders. § 212, 46 U. S. C. § 1122. And he was empowered to "enter into such contracts, upon behalf of the United States, . . . as may, in . . . his discretion, be necessary to carry on the activities authorized by this chapter, or to protect, preserve, or improve the collateral held by the [Federal Maritime] Commission or Secretary to secure indebtedness, in the same manner that a private corporation may contract within the scope of the authority conferred by its charter." § 207, as set forth in 46 U. S. C. § 1117.

Central to the legislative scheme was the creation of an arsenal of grant and loan programs for use in the Secretary's efforts to stimulate domestic construction and make operation

(a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States, insofar as may be practicable, (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel, and (e) supplemented by efficient facilities for shipbuilding and ship repair. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine." 46 U. S. C. § 1101.

by domestic crews competitive. Included were an operating subsidy program, Title VI, 46 U. S. C. § 1171 *et seq.;* a program pursuant to which the Secretary could directly acquire new or reconditioned vessels and charter or sell them, Title VII, 46 U. S. C. § 1191 *et seq.;* a loan guarantee program, Title XI, 46 U. S. C. § 1271 *et seq.;* and the CDS program that lies at the core of the present litigation, Title V, 46 U. S. C. § 1151 *et seq.*[26] Again, the Secretary's discretion in administering these programs was substantial.

It was recognized from the outset that substantial limits would have to be placed upon the entry of subsidized vessels into the domestic trade.[27] Any other result would have been disastrous for the unsubsidized Jones Act fleet for which that trade was (and is) reserved. Burdened by higher construction costs, greater outstanding debt, and higher operating expenses,

---

[26] The first section dealing with the CDS program, § 501, 46 U. S. C. § 1151, gives the Secretary considerable discretion to process, accept, and reject subsidy applications. Sections 502 and 504, 46 U. S. C. §§ 1152, 1154, authorize him to subsidize construction either by contracting directly with a shipyard for a vessel and then selling the completed ship to private parties at a cost corresponding to the cost of constructing a similar vessel abroad, or by contracting to pay only the appropriate CDS to the shipyard and letting the owner-operator remit the balance of the cost to the yard and take title directly. Those sections also set forth means of calculating foreign costs and subsidies, various limitations on such subsidies, terms of sale, and other requirements. Section 503, 46 U. S. C. § 1153, requires that subsidized vessels be documented under the laws of the United States and spells out various financial requirements. Section 505, 46 U. S. C. § 1155, requires that domestic shipyards and materials be used to construct subsidized vessels. And § 506, 46 U. S. C. § 1156, see n. 2, *supra,* contains the requirement that owners of subsidized vessels agree not to operate in domestic commerce except as specifically provided.

[27] H. R. Doc. No. 118, 74th Cong., 1st Sess., 22 (1935) (Report of the Interdepartmental Committee on Shipping Policy). See also H. R. Rep. No. 1277, 74th Cong., 1st Sess., 22 (1935) (describing 1935 version of the Act and noting that the Government may in certain circumstances consent to the operation of a subsidized vessel in the domestic trade "in which case the amount of the subsidy shall be repaid to the United States proportionately. . .").

that fleet would simply have been unable to compete with new vessels enjoying the benefits of the 1936 Act.

The congressional response to this problem as it relates to the CDS program was § 506.[28]   Basically, that section confines subsidized vessels to the foreign trade.   Congress recognized, however, that an entirely rigid prohibition on entry into domestic commerce might be impractical—incidental domestic operation on one segment of a voyage in foreign trade might well be efficient, and other circumstances might also arise in which some flexibility would be desirable.   Accordingly, Congress permitted subsidized vessels to carry domestic cargoes on one leg of certain foreign voyages and provided in addition that the Secretary could authorize such vessels actually to enter the domestic trade for six months or less in any year upon finding that such entry would be "necessary or appropriate to carry out the purposes of this chapter."   In an effort to ensure that subsidized vessels operating in domestic trade pursuant to these exceptions would compete on an equal footing with unsubsidized vessels similarly employed, Congress required the repayment of that portion of the outstanding subsidy allocable to the vessel's domestic activities.

The Court of Appeals was of the view that the specific exceptions in § 506 marked the limit of the Secretary's authority to approve entry of subsidized vessels into the domestic trade.   By its logic, detail, and legislative history, the panel majority reasoned, that section prohibits transactions like the one before us.   In consequence, that court found the broad sweep of the Secretary's power under the balance of the Act irrelevant, the express language giving the Secretary authority to make and amend contracts[29] unimportant, and the policy arguments advanced by the Secretary unpersuasive.

---

[28] See n. 2, *supra*.

[29] See § 504 of the Act, 46 U. S. C. § 1154, and § 207, 46 U. S. C. § 1117. The former provision expressly authorizes the Secretary to make and amend CDS contracts.

We disagree. On the face of the statute, the Secretary's broad contracting powers and discretion to administer the Act seem to comprehend the authority urged by petitioners here. Indeed, as the Secretary found in the present case, a permanent release from the foreign-trade-only requirement may quite directly further the general goals of the Act by protecting the Government's position as guarantor of substantial financial obligations and improving the chances that a domestic shipyard will survive. Further, we are hard pressed to find anything in § 506 that suggests that the Secretary is forbidden to approve transactions of this sort under these circumstances. Certainly nothing in the language of that section so manacles the Secretary as to require the result reached below. Rather, § 506 simply mandates that vessels enjoying the benefits of a subsidy may move *in and out* of domestic commerce only under narrowly circumscribed conditions. It speaks to *temporary* releases from the foreign-trade-only requirement, and *only* to such releases. Moreover, for Congress to draft a section directed to the particular problems posed by temporary entry into the domestic trade was entirely logical since such releases pose problems not present in *permanent* releases of the sort at issue here. Specifically, a vessel with an outstanding CDS that was completely free to enter and depart the domestic trade would be in an extraordinarily favorable competitive situation even if it was required to repay a proportionate amount of its subsidy whenever it did so. Absent some restriction on its ability to move from one market to the other, it would be a formidable force in both, capable of taking advantage of every shift in trade and profitability, skimming the cream and leaving what remains to those less mobile. It could, in a very real sense, have the best of both worlds.[30]

---

[30] The discussion in the text demonstrates that regardless of subsidy repayment there is considerable reason to restrict the extent to which subsidized vessels may enter and exit the domestic market. The need for limits is

Section 506 responds to this problem by permitting a vessel that enjoys the benefits of a CDS to operate outside the foreign market only in narrow circumstances, generally upon a highly discretionary administrative decision, and for no more than six months a year. And we have no doubt that it would be flatly inconsistent with the congressional intent were the Secretary or this Court to conclude that a *temporary* release not meeting these conditions was proper. But a *permanent* release upon full repayment is quite different. It irrevocably locates the vessel in the unsubsidized fleet and thus poses no danger of a supercompetitor skimming the cream from each market. It creates no long-term instability. And it confers no windfall. On the contrary, at least where repayment of the CDS includes some amount reflecting capital costs which would have been incurred had no subsidy been available,[31]

---

heightened by the fact that proportionate subsidy repayment will generally fail to equalize the actual costs borne by owners of subsidized and unsubsidized vessels in domestic commerce. The problem is that the repayment formula in § 506 does not require the subsidized vessel to make any repayment to compensate for the interest it has not had to pay. To give a somewhat oversimplified example, compare two hypothetical vessels that operate for six months in domestic commerce, one unsubsidized and constructed with a $100 million, 10% loan, and the other subsidized and built with a $50 million CDS and a $50 million, 10% loan. During a given 6-month period the former vessel's interest will be $5 million (½ x 10% x $100 million). The latter will pay interest of $2.5 million (½ x 10% x $50 million) and a CDS repayment of $1.25 million (6/240 (months' useful life) x $50 million). In short, the subsidized vessel's expenses will be $1.25 million less, and its competitive posture all the more formidable. On the importance of interest in the permanent-release/full-repayment situation, see *infra,* this page, and n. 31.

[31] The need for some payment reflecting avoided capital costs was highlighted by Judge Bazelon's dissent to the opinion below. *Alaska Bulk Carriers, Inc.* v. *Kreps,* 194 U. S. App. D. C. 7, 36, n. 15, 595 F. 2d 814, 843, n. 15 (1979). In their brief, the federal parties represent that, while the Secretary originally concluded that no payment for interest would be required, the agency now intends to seek a reasonable amount of interest. Brief for Federal Parties 54, n. 59. Failure to do so might raise serious questions of inconsistency with the entire thrust of the Act.

such a transaction merely permits a once subsidized vessel to enter the domestic trade on a footing equal to that of vessels already in that trade. It was not the purpose of the Act to prohibit such entry, and we accordingly agree with the District Court that *"nothing* in section 506, [or] in any other provision of Title V, . . . either expressly or implicitly addresses the issue of *permanent* revocation of a CDS contract." 445 F. Supp., at 1135 (emphasis in original).

We turn now to the Court of Appeals' arguments concerning the legislative history of § 506. The panel majority was of the view that that history demonstrates that Congress addressed the problem before us and affirmatively decided not to permit the Secretary to approve transactions like the one at issue. We disagree. At most, we find the legislative history ambiguous, even puzzling. We do not find that it demonstrates that Congress has decided the present question.

We begin with the version of § 506 originally enacted as part of the 1936 Act. The first sentence of that version stated that it would be unlawful to operate any subsidized vessel other than exclusively in foreign trade or on incidental domestic portions of voyages in foreign trade, but provided that the Maritime Commission had authority to consent to operation that would otherwise be unlawful so long as the owner agreed to repay "an amount which bears the same proportion to the construction subsidy theretofore paid . . . as the remaining economic life of the vessel bears to its entire economic life." The second sentence provided that in cases of "emergency" the Commission could permit transfer of a subsidized vessel to "service other than exclusive operation in foreign trade" provided that no operating subsidy were paid during the emergency period and that period was limited to three months. And the third sentence specified that owners of a vessel operated on incidental domestic portions of voyages in foreign trade would have to make a proportionate subsidy repay-

ment.[32]   It seems abundantly clear that this section provided for three different exceptions to the foreign-trade-only requirement: (1) subsidized vessels could also carry out incidental tasks in domestic trade (sentence one)—in which case consent of the Commission would not be required, but pro rata subsidy repayment would have to be made (sentence three), (2) such vessels could operate *permanently* in domestic trade

---

[32] As originally enacted, Section 506, 49 Stat. 1999, provided in its entirety as follows:

"It shall be unlawful to operate any vessel, for the construction of which any subsidy has been paid pursuant to this title, other than exclusively in foreign trade, or on a round-the-world voyage or a round voyage from the west coast of the United States to a European port or ports or a round voyage from the Atlantic coast to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at an island possession or island territory of the United States, unless the owner of such vessel shall receive the written consent of the Commission so to operate and prior to such operation shall agree to pay to the Commission, upon such terms and conditions as the Commission may prescribe, an amount which bears the same proportion to the construction subsidy theretofore paid or agreed to be paid (excluding cost of national-defense features as hereinbefore provided), as the remaining economic life of the vessel bears to its entire economic life.  If an emergency arises which, in the opinion of the Commission, warrants the temporary transfer of a vessel, for the construction of which any subsidy has been paid pursuant to this title, to service other than exclusive operation in foreign trade, the Commission may permit such transfer: *Provided,* That no operating differential subsidy shall be paid during the duration of such temporary or emergency period, and such period shall not exceed three months.  Every contractor receiving a contract for a construction-differential subsidy under the provisions of this title shall agree that if the subsidized vessel engages in domestic trade on a round-the-world voyage or a round voyage from the west coast of the United States to a European port or ports or loads or discharges cargo or passengers at an island possession or island territory as permitted by this section, that the contractor will repay annually to the Commission that proportion of one-twentieth of such construction subsidy as the gross revenue of such protected trade bears to the gross revenue derived from the entire voyages completed during the preceding year."

upon the consent of the Commission and repayment of the unamortized portion of the subsidy (sentence one),[33] and (3) such vessels could, upon a Commission finding of emergency, enter domestic trade for up to three months without subsidy repayment (sentence two).

In 1938, § 506 was rewritten into substantially its present form. The objective consequences of that rewriting were, first, that all the language suggesting that a permanent release from trade restrictions upon full subsidy repayment would be appropriate was deleted and, second, that the provision authorizing a 3-month "emergency" release with no subsidy repayment was altered by eliminating the emergency requirement, changing the 3-month limit to 6 months and requiring proportionate subsidy repayment. In substance, the balance of the provision was left unchanged.

Respondents and the Court of Appeals contend that this rewriting embodied a considered congressional judgment that permanent release upon full repayment should not be permitted. They rely to a considerable extent upon the comments of Joseph P. Kennedy, Chairman of the Maritime

---

[33] The Court of Appeals conceded that permanent domestic operation was permitted under this second exception, and respondents appear reluctantly to have followed suit. Further, as the Court of Appeals recognized, this reading is buttressed by the legislative history of the 1936 Act. See 194 U. S. App. D. C., at 19, n. 43, 595 F. 2d, at 826, n. 43 (citing legislative history). Moreover, the statute itself admits of no other interpretation. It provides for repayment of "an amount which bears the same proportion to the construction subsidy . . . as the remaining economic life of the vessel bears to its entire economic life." That amount necessarily would represent the entire portion of the subsidy allocable to the vessel's remaining life—for a new vessel it would constitute the entire subsidy, for a vessel halfway through its life, half the subsidy, etc. It is hardly conceivable that Congress would have intended repayment of the *entire* unamortized subsidy in exchange for only a temporary release from the foreign-trade-only requirement. Thus, only permanent release could have been contemplated.

Commission. During hearings on the measure he stated as follows:

> "Section 506 has been entirely rewritten to remove ambiguities and confusion. The section now provides that the owner can only engage in foreign trade exclusively with certain enumerated excepted services, for which services the owner is required to repay part of the construction-differential subsidy. There are also provisions which appear to give owners the right to engage in services other than the excepted ones, if the Commission consents to such use and the owner repays part of the construction-differential subsidy. Whether this right is restricted to the cases of emergency and to periods of 3 months as mentioned in the section, it is difficult to determine." [34]

The ambiguity referred to by Mr. Kennedy, the Court of Appeals concluded, was that hinted at in the final sentence of the quoted remarks—whether the "right to engage in services other than excepted ones" upon subsidy repayment was restricted to 3-month emergencies. And that ambiguity was resolved, the argument goes, by the decision to delete all language authorizing a permanent release and to rewrite the temporary release provision so that the "right" referred to by Mr. Kennedy could only be exercised for six months in any year. Accordingly, we are told, the intention of Congress to bar the transaction at issue here was "unmistakably manifested." 194 U. S. App. D. C., at 22, 595 F. 2d, at 829.

We find the contention that anything was unmistakable in these snippets of legislative history exceedingly curious. In the first place, it seems scarcely possible that Congress actually thought the original version ambiguous in the regard apparently referred to by Mr. Kennedy. As we have already

---

[34] Amending Merchant Marine Act, 1936: Hearings on H. R. 8532 before the House Committee on Merchant Marine and Fisheries, 75th Cong., 2d and 3d Sess., 8 (1937–1938).

noted, no reading of that provision other than one permitting permanent waiver is possible given the mechanism set forth for calculation of the amount of subsidy repayment due.[35] Moreover, there is in fact no indication that Congress intended to make the major alterations claimed. Indeed, the House Report states that "[n]o fundamental change in the original purpose of the section has been effected," [36] and the Senate Report, while to some extent tracking Mr. Kennedy's comments, seems to identify the major change effected by the amendments as the addition of language making it "perfectly clear that unless the owner operates exclusively in foreign trade, he must repay a portion of the construction-differential subsidy for any service in which the vessel is engaged which includes domestic ports. . . ." [37] There is no language suggesting that Congress intended to rule out permanent releases of the type at issue here.[38]

We do not go so far as to assert with confidence that the deletion of the authorization contained in the second half of the first sentence of the 1936 version was inadvertent. Rather

---

[35] See n. 23, *supra.*

[36] H. R. Rep. No. 2168, 75th Cong., 3d Sess., 21 (1938).

[37] S. Rep. No. 1618, 75th Cong., 3d Sess., 13 (1938). Similarly, the House Report stated that under the new version "the obligations of the owner to repay part of the subsidy are clearly defined." H. R. Rep. No. 2168, *supra,* at 21. Petitioners argue that such language supports the contention that the ambiguity actually troubling to Congress was whether proportional subsidy repayment would be required for temporary or incidental use in domestic trade and had nothing to do with the permanent-release issue.

[38] Interestingly, one of the spokesmen for unsubsidized carriers who testified during the Senate hearings suggested that Congress should substitute for the amendments to § 506 then under discussion a new section "prohibiting subsidized vessels and vessels which have at any time been subsidized, from the intercoastal service." Amending The Merchant Marine Act of 1936: Hearings on S. 3078 before the Senate Committee on Commerce and the Committee on Education and Labor, 75th Cong., 2d Sess., pt. 2, p. 44 (1937).

we are simply unsure of the precise significance of that dele-
tion. What does seem clear is that it did not represent a
considered congressional judgment that the permanent-release/
full-repayment transaction before us should be prohibited.

## IV

Our conclusion that Congress did not forbid the transactions
here at issue is buttressed by two additional factors. First,
the agency has consistently interpreted the Act to permit full-
repayment/permanent-release arrangements.[39] Thus, in 1964
two vessels owned by Grace Line were permitted to repay the
unamortized portion of subsidies in exchange for the removal
of restrictions on their entry into domestic trade.[40] And in
late 1976 and early 1977 two conditional requests for per-
manent release were granted to the owners of vessels employed
in the Virgin Islands trade. The owners were concerned with
the prospect that that trade might in the future be classified
as domestic and were informed that they could obtain waivers
if that eventuality were to occur.[41] While the agency's ration-
ale has not always been entirely persuasive,[42] it has not
wavered from its general understanding of its powers and the
extent to which their exercise is consistent with the goals of
the Act.

More importantly, in 1971 and 1972 Congress seems clearly
to have contemplated transactions of the sort challenged here.

---

[39] The relevant precedents are listed in Affidavit of James S. Dawson,
Jr., Secretary of Maritime Administration, App. 164–166.

[40] Comptroller General Decision B–155039, 44 Comp. Gen. 180 (1964).
The Court of Appeals sought to distinguish the Grace Line precedent on
grounds the subsidies there were not used in initial construction of the
vessels, but rather to convert them from cargo to container. We fail to
see the relevance of this distinction.

[41] App. 165.

[42] See 194 U. S. App. D. C., at 35, 595 F. 2d, at 842 (dissenting opinion
of Judge Bazelon criticizing administrative rationale in the Grace Line
case).

In 1972, a new § 1104 (a) (3), 86 Stat. 911, 46 U. S. C. § 1274 (a) (3), was added to the Act.  As originally proposed, the section provided that the agency could aid in financing repayment of "any amount of construction-differential subsidy paid with respect to a vessel pursuant to Title V of this Act . . . in order to release such vessel from all restrictions imposed as a result of the payment of [that] subsidy. . . ." [43] As enacted, the section did not include the language relating to release from all restrictions.  The House Committee explained the deletion as follows:

"In the entire history of the administration of the 1936 Act there has been only one instance where a construction-differential subsidy repayment, authorized by the Secretary under very special circumstances, could have called into play the provisions of this paragraph.  Your Committee questions the desirability of general legislation to deal with such an unusual situation, and feels that Title XI assistance should be extended to all instances of subsidy repayments under Title V, so as to include the relatively frequent situation of repayments under the first sentence of section 506 of the Act.  Your Committee has therefore amended the legislation by deleting the language [relating to release from all restrictions].  This paragraph in Title XI does not in any way extend or affect the application of Title V of the Act." [44]

The understanding of the 92d Congress seems clear.  And while the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, *Teamsters* v. *United States*, 431 U. S. 324, 354, n. 39 (1977), such views are entitled to significant weight, *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 275 (1974), and particularly so when the precise intent of the enacting Congress is obscure.

---

[43] H. R. 9756, 92d Cong., 1st Sess., § 3 (1971).

[44] H. R. Rep. No. 92–688, p. 10 (1971).

## V

In conclusion, we hold that the Act empowers the Secretary to approve full-repayment/permanent-release transactions of the type at issue here. We express no view upon respondents' claim that if such authority exists under the Act full repayment may not be made by promissory note. This issue was not addressed by the Court of Appeals and is open for its consideration on remand. Further, we express no view upon the merits of the Secretary's particular exercise of discretion with regard to the *Stuyvesant* since that issue is not before us.

*Reversed and remanded.*