ALASKA BULK CARRIERS, INC., Trinidad Corporation, Appellants,

v.

Andrew L. LEWIS, Jr., Secretary of Transportation, U. S. Department of Transportation, et al.

SHELL OIL COMPANY (a Delaware Corporation), Appellant,

v.

Andrew L. LEWIS, Jr., Secretary of Transportation, U. S. Department of Transportation, et al.

ALASKA BULK CARRIERS, INC., Trinidad Corporation

v.

Andrew L. LEWIS, Jr., Secretary of Transportation, U. S. Department of Transportation, et al.

Polk Tanker Corporation, et al., Appellants.

SHELL OIL COMPANY (a Delaware Corporation)

v.

Andrew L. LEWIS, Jr., Secretary of Transportation, U. S. Department of Transportation, et al.

Seatrain Shipbuilding Corp. and Polk Tanker Corp., Appellants.

Nos. 77–2080, 78–1211, 78–1212 and 78–1281.

United States Court of Appeals, District of Columbia Circuit.

Considered Without Oral Argument.

Decided June 25, 1982.

---

Amy Loeserman Klein, Olga Boikess, William Karas and Kathleen Mahon, Washington, D. C., were on the brief for appellants Alaska Bulk Carriers, Inc. and Trinidad Corp.

Stephen N. Shulman, Joseph A. Artabane and Mark C. Ellenberg, Washington, D. C., were on the brief for appellant Shell Oil Co.

Alice Daniel, Asst. Atty. Gen., Dept. of Justice, Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, and Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., were on the brief for federal appellees.

Before WILKEY, Circuit Judge, BAZELON and McGOWAN, Senior Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

This case, which is before us on remand from the Supreme Court,[1] involves the construction-differential subsidy program authorized by Title V of the Merchant Marine Act.[2] The Supreme Court held that the Act authorizes the Secretary of Commerce[3] to release a ship from the operating restrictions of the CDS program in exchange for the full repayment of the subsidy received. The issue before us on remand is whether the Secretary has authority under the Act to accept full repayment of a CDS in the form of a promissory note. We conclude that the Secretary has such authority, provided that the terms of the promissory note place the shipowner on an equal financial footing with a shipowner who never participated in the CDS program.

## I. BACKGROUND[4]

Because the costs of constructing ships in the United States and operating them with

---

1. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980).

2. 46 U.S.C. § 1151 *et seq.* (1976).

3. Pursuant to the Maritime Act of 1981, Pub.L. 97–31, 95 Stat. 151, the functions of the Secretary of Commerce under the Merchant Marine Act of 1936, have been transferred to the Secretary of Transportation.

4. For a more complete description of the background of this case, *see Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 574–79, 584–87, 100 S.Ct. 800, 802–805, 807–809, 63

American crews are higher than comparable costs in foreign ports, Congress has enacted a number of laws designed to protect the United States shipping and shipbuilding industries. The Merchant Marine Act of 1936,[5] intended to promote American participation in foreign trade, is a central pillar of that statutory system. In order to make up for the cost disadvantages of American shipbuilding, Title V of that Act authorizes the Secretary of Commerce to subsidize up to 50% of the cost of constructing a ship in this country. In return for receiving this "construction-differential subsidy" (CDS), section 506 [6] requires the owner of the ship to agree to operate it exclusively in foreign trade except under certain limited circumstances.[7]

Beginning in the early 1970s, Seatrain Shipbuilding Corporation began building the *Stuyvesant*, a 225,000 deadweight ton oil tanker. At that time, Polk Tanker Corporation, Seatrain's affiliate and purchaser of the *Stuyvesant*, agreed to operate the ship exclusively in foreign trade, so that Seatrain received a CDS of $27.2 million.[8] By the time construction of the *Stuyvesant* was completed, however, Polk was unable to find employment for the ship in foreign trade. The employment opportunity that Polk eventually found for the *Stuyvesant* was in the transportation of Alaskan oil to the eastern United States and the Carribbean. But because that trade is domestic rather than foreign, the *Stuyvesant* was barred from employment there by section 506 of the Act. To overcome that obstacle, Polk agreed to repay the CDS with a twenty-year promissory note if the Secretary of Commerce would release the *Stuyvesant* from the section 506 restrictions. The Secretary acceded to the permanent-release/full-repayment agreement for four reasons: First, there were no employment opportunities open to the *Stuyvesant* in foreign trade; second, employment in the Alaskan trade would strengthen the collateral that secured government-guaranteed loans to Seatrain;[9] third, employment in the Alaskan trade might prevent default on those obligations; and fourth, if the *Stuyvesant* were not permitted to operate in domestic trade, the Seatrain Shipbuilding Corporation might not be able to continue operation.

---

L.Ed.2d 36 (1980); *Alaska Bulk Carriers, Inc. v. Kreps*, 595 F.2d 814, 817–21 (D.C.Cir.1979).

**5.** 46 U.S.C. § 1101 *et seq.* (1976).

**6.** 46 U.S.C. § 1156 (1976).

**7.** Section 506 provides:

Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade, or on a round-the-world voyage, or on a round voyage from the west coast of the United States to a European port or ports which includes intercoastal ports of the United States, or a round voyage from the Atlantic coast of the United States to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at the State of Hawaii, or an island possession or island territory of the United States, and that if the vessel is operated in the domestic trade on any of the above-enumerated services, he will pay annually to the Secretary of Commerce that proportion of one-twenty-fifth of the construction-differential subsidy paid for such vessel as the gross revenue derived from the domestic trade bears to the gross revenue derived from the entire voyages completed during the preceding year. *The Secretary may consent in writing to the temporary transfer of such vessel to service other than the service covered by such agreement for periods not exceeding six months in any year, whenever the Secretary may determine that such transfer is necessary or appropriate to carry out the purposes of this chapter. Such consent shall be conditioned upon the agreement by the owner to pay to the Secretary, upon such terms and conditions as he may prescribe, an amount which bears the same proportion to the construction-differential subsidy paid by the Secretary as such temporary period bears to the entire economic life of the vessel. No operating-differential subsidy shall be paid for the operation of such vessel for such temporary period.*
(Emphasis added.)

**8.** Seatrain also received government-guaranteed loans under Title XI of the Act in addition to loans and loan guarantees from the Economic Development Administration. *See Alaska Bulk Carriers, Inc. v. Kreps*, 595 F.2d 814, 819–20 (D.C.Cir.1979).

**9.** *See* note 8 *supra*.

Before the closing of the complex transaction that would have implemented the permanent-release/full-repayment agreement, appellants filed an action in the district court seeking declaratory and injunctive relief prohibiting the Secretary from granting a permanent release from the section 506 foreign-trade-only requirement.[10] Appellants argued that the Secretary lacked authority to grant such a release, and that, even if the Secretary had the authority, the exercise of the authority in this case was an abuse of discretion.

On November 22, 1977, the district court ruled that the Secretary had the authority to release the *Stuyvesant* from the section 506 restrictions in exchange for full repayment of the CDS, and that the Secretary had the authority to accept repayment in the form of a promissory note.[11] The court also held, however, that the Secretary had abused her discretion by releasing the *Stuyvesant* from the trade restrictions without analyzing the effect that release would have on the Alaskan trade. The court, therefore, remanded the case to the Secretary for further proceedings but certified its decision as final under Rule 54(b) of the Federal Rules of Civil Procedure.

Alaska Bulk Carriers, Inc., Trinidad Corporation, and Shell Oil Co. appealed the district court's decision to this court and we reversed, holding that the Merchant Marine Act did not authorize the Secretary to enter into a permanent-release/full-repayment agreement.[12] The Supreme Court, however, reversed this court and remanded the case to us for review of that part of the district court's decision holding that the Secretary was authorized to accept a promissory note as repayment of the subsidy.[13]

## II. ANALYSIS

As stated above, the Supreme Court has held that the Secretary of Commerce had the authority to release the *Stuyvesant* from the foreign-trade-only restriction in exchange for full repayment of the CDS. The Court based its decision on the "Secretary's broad contracting powers and discretion to administer the Act." [14] Finding that nothing in the Act prohibits the Secretary from entering into a permanent-release/full-repayment agreement, the Court stated that such an agreement "may quite directly further the general goals of the Act by protecting the Government's position as guarantor of substantial financial obligations and improving the chances that a domestic shipyard will survive." [15] The Court contrasted a permanent-release agreement with the type of temporary releases governed by section 506,[16] noting that the former unlike the latter can neither create long-term instability in the domestic shipping market nor confer a windfall on a previously subsidized ship. The Court stated that "at least where repayment of the CDS includes some amount reflecting capital costs which would have been incurred had no subsidy been available, such a transaction merely permits a once subsidized ves-

**10.** Alaska Bulk Carriers, Inc. and Trinidad Corp. filed one complaint and Shell Oil Co. filed another. The two actions were consolidated, however, before the district court.

**11.** *Shell Oil Co. v. Kreps*, 445 F.Supp. 1128 (D.D.C.1977).

**12.** *Alaska Bulk Carriers, Inc. v. Kreps*, 595 F.2d 814 (D.C.Cir.1979).

**13.** *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980).

**14.** 444 U.S. at 588, 100 S.Ct. at 809. The broad contracting powers that the Act confers upon the Secretary are contained in section 207, 46 U.S.C. § 1117 (1976), which provides:

The Federal Maritime Commission and the Secretary of Commerce may enter into such contracts, upon behalf of the United States, and may make such disbursements as may, in its or his discretion, be necessary to carry on the activities authorized by this chapter, or to protect, preserve, or improve the collateral held by the Commission or Secretary to secure indebtedness, in the same manner that a private corporation may contract within the scope of the authority conferred by its charter.

**15.** 444 U.S. at 588, 100 S.Ct. at 809.

**16.** *See* note 7 *supra.*

sel to enter the domestic trade on a footing equal to that of vessels already in that trade." [17]

By a parity of reasoning, the Secretary must have authority to accept repayment of a CDS in the form of a promissory note. The broad contracting powers of the Act easily encompass the use of a promissory note.[18] Furthermore, no provision of the Act explicitly prohibits the use of such an instrument. And finally, there is nothing inherent in repayment through a promissory note that conflicts with the purposes of the Act: Such an irrevocable obligation does not create instability in the domestic shipping market; nor does it confer a windfall on the owner of a previously subsidized ship, provided that the principal of the note covers the full economic benefit of the CDS and the terms of the note are equivalent to the financing terms available to shipbuilders in general.

Appellant Shell Oil Co. argues that the use of a promissory note violates the Merchant Marine Act because it could convert a permanent-release/full-repayment agreement into a temporary-release/partial-repayment agreement that is prohibited by section 506. Shell argues that, at any time in the future, with no regard for the six-month temporary-waiver limit of section 506,[19] the Secretary could forgive or postpone the obligation to make payments on

the note in exchange for the *Stuyvesant's* reentry into foreign trade. Moreover, through a sequence of these agreements, Shell argues, a ship could move between foreign and domestic trade "at will" [20] and thereby create the "long-term instability" that the Act was intended to prevent.[21] We disagree. Such revocability is not inherent in the use of a promissory note to repay a CDS. There is no indication in this case that the Secretary anticipated anything less than full and timely payment on the note. Nor is it likely that the Secretary would be authorized under the Act to accept less than full repayment.[22] As we interpreted the Secretary's agreement with Polk, the use of a promissory note as the instrument of repayment renders the change in the *Stuyvesant's* status no less permanent than if the CDS were repaid in cash.

Shell also makes two additional points concerning the promissory note specifically at issue here. First, Shell claims that the interest rate on the note is lower than the rate that would have been available to a shipbuilder who never received a CDS.[23] Second, Shell claims that the note does not cover the interest costs that Seatrain avoided as a result of receiving the CDS. If either of these claims is valid, the terms of the note should be amended to place the *Stuyvesant* on the same financial footing as similarly situated ships that never received a CDS. A central basis for the Supreme

---

**17.** 444 U.S. at 589–90, 100 S.Ct. at 810 (footnote omitted).

The Supreme Court ended its opinion by stating, "we express no view upon the merits of the Secretary's particular exercise of discretion with regard to the *Stuyvesant* since that issue is not before us." 444 U.S. at 597, 100 S.Ct. at 814. One aspect of this particular exercise of discretion, upon which we also express no view, is the Secretary's consideration of the competitive impact that would attend the *Stuyvesant's* entry into the Alaskan oil trade. The district court remanded the case to the Secretary for consideration of those competitive consequences. *Shell Oil Co. v. Kreps*, 445 F.Supp. 1128, 1142–44 (D.D.C.1977). *See also* 444 U.S. at 578–79 n.11, 100 S.Ct. at 578–579 n.11. The other aspect of this exercise of discretion, which we address but ultimately remand to the district court for further findings, is whether the promissory note at issue here conforms to the mandate of the Act. *See* p. 240 *infra.*

**18.** *See* note 14 *supra.*

**19.** Shell Supplemental Brief at 3–4.

**20.** *Id.* at 3.

**21.** 444 U.S. at 589, 100 S.Ct. at 810.

**22.** The government states that "this type of transaction would be unauthorized by section 506 of the Act." Federal Appellees' Supplemental Brief at 15 n.17.

**23.** Title XI of the Act provides a general scheme for government guarantees of loans to shipbuilders. Shell argues that the terms of the note at issue here were more favorable than the terms a shipbuilder could have received under the Title XI scheme at the time Polk and the Secretary agreed to the CDS repayment.

Court's conclusion that the Secretary was authorized to enter into a permanent-release/full-repayment agreement was that such an agreement inherently "confers no windfall." [24] If an agreement provides for repayment through a promissory note, it is obvious that the terms of the note must be equivalent to the terms generally available to shipbuilders in order to prevent the conferral of a windfall. Specifically, the interest rate on such a note must be set at the same rate a shipbuilder would have to pay if he or she were arranging initial financing for a ship to be employed in domestic trade.[25] Similarly, as the Supreme Court stated explicitly, the repayment of a CDS must also cover the capital costs that Seatrain would have borne if it had never received a CDS.[26] This is true regardless of whether the CDS is repaid with a promissory note or with cash.

Because the district court made no findings concerning the terms of the promissory note at issue here, we are unable to determine whether the details of the note conform with the mandate of the Act as interpreted by the Supreme Court and by this court. Therefore, we remand the case to the district court for further proceedings and for entry of a judgment consistent with this opinion.

*So ordered.*

---

**24.** 444 U.S. at 589, 100 S.Ct. at 810.

**25.** The temporal frame of reference for this comparison should be the time at which the CDS repayment is agreed upon.

**26.** For an example of how the repayment of capital costs relates to the equivalence of financial burden between a once-subsidized ship and a ship that was never subsidized, *see* 444 U.S. at 588–89 n.30, 100 S.Ct. at 809–810 n.30.

The Supreme Court noted that the Secretary has recognized the need for the repayment of capital costs and has agreed to seek such repayment. 444 U.S. at 589 n.31, 100 S.Ct. at 810 n.31.