EDITH H. JONES, Circuit Judge,
with whom GEE, JOLLY, HIGGINBOTHAM, and DAVIS, Circuit Judges join, dissenting:
The issue the majority addresses is, in their view, “simply one of statutory construction.” Yet this “simple” inquiry produces a monumental elaboration whose end result is to reject the reasonable construction of 11 U.S.C. § 361 reached by the Ninth Circuit, two other courts of appeals and numerous lower courts. The elaboration tends to obscure the fact that the majority have significantly modified, rather than interpreted, the adequate protection provision of the Bankruptcy Code. Like the Ninth Circuit, I find that a proper reading of § 361 requires adequate protection of a secured creditor for the bankruptcy-created delay in enforcing his lien against collateral. The conclusion reached by the majority favors extended delay in the bankruptcy process, affirmatively harms secured creditors while benefitting only debtors, and will create a rush of forum-shopping by debtors into the already beleaguered bankruptcy courts of the Fifth Circuit. Because the majority have erred and the consequences of its error are profound, I respectfully dissent.
Recapitulating the legal posture of this case, Timbers’ resort to relief under Chapter 11 of the Bankruptcy Code activated the automatic stay, 11 U.S.C. § 362(a), the cornerstone of bankruptcy, and prevented action by creditors to collect Timbers’ outstanding debt.[1] The secured creditor sought relief from the stay “for cause, including lack of adequate protection.” 11 U.S.C. § 362(d)(1). United Savings argues that “adequate protection” requires compensation for the delay bankruptcy causes in preventing foreclosure and its ability to realize value through its collateral. Hence, if Timbers cannot provide such protection— by way of payments during bankruptcy, additional liens or guarantees or some other method — United Savings may foreclose. The bankruptcy court was persuaded by this argument, which has been adopted by three circuit courts of appeals and rejected by none prior to today’s decision.[2]
Section 361 of the Bankruptcy Code does not expressly state that a secured creditor, as an entity with an interest in the debtor’s property, must receive compensation on account of its damages for delay in foreclosing. It provides as follows:
§ 361 Adequate protection.
When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity’s interest in such property;
(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity’s interest in such property; or
(3) granting such other relief, other than entitling such entity to compensa *376 tion allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity’s interest in such property.
This Court’s responsibility is to effectuate the “plain meaning” of the statutory language. Watt v. Alaska, 451 U.S. 259, 265-66, 101 S.Ct. 1673, 1677-78, 68 L.Ed.2d 80 (1981); American Mariner, 734 F.2d at 430. Unlike the majority, I find considerable support within § 361 for a requirement that adequate protection compensate a secured creditor for the delay occasioned by bankruptcy.
According to §§ 361(1) and (2), adequate protection must recompense the decrease in “value of [an] entity’s interest in [the debt- or’s] property” where that decrease is caused by the automatic stay. Adequate protection must permit the creditor to realize the “indubitable equivalent” of his “interest in the debtor’s property.” § 361(3). These emphasized phrases are critical to proper interpretation of Section 361.
The majority argue that the “value of an entity’s interest in the debtor's property” means the “value of the collateral” and nothing more.[3] If Congress had wanted to limit adequate protection to a decline in the value of collateral, it could have done so, but it did not. Significantly, in enacting the Bankruptcy Judges, United States Trustee, and Family Farmer Bankruptcy Act of 1986 (hereafter, the “Family Farmer Act”), P.L. 99-554, Congress redefined adequate protection for creditors of farmers. Such secured creditors may receive compensation only to the extent of decreases “in the value of property securing a claim or of an entity’s ownership interest in property.” (emphasis added). 11 U.S.C. § 1205. Congress there expressly confined adequate protection to the value of the collateral. The “value of an entity’s interest” in the debtor’s property, a broader term, therefore requires more careful analysis than the majority has performed.
One must consider the essential nature of a secured transaction according to state law in order to evaluate the impact of bankruptcy upon the “value” of the secured creditor's interest. In a bankruptcy case involving the rights of a secured creditor, the Supreme Court has observed that “[property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.” Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136, 141-42 (1979).
A creditor ordinarily takes security because it has loaned money to a debtor in the expectation of being repaid at a later date. The security device is not the limit of its “interest” in the transaction, however.[4] The secured creditor’s incentive to make the loan, and its profit, is the contract interest it will receive pending repayment of the principal. Taking collateral is but a means to accomplish this end. Absent bankruptcy, under state law, a debtor’s default triggers the right of the secured creditor to obtain ownership of the collateral through foreclosure. The secured creditor then disposes of the collateral and, to the extent possible, restores its inventory of cash to re-lend at a profit.
The automatic stay in bankruptcy distorts the secured creditor’s state-law rights in the collateral, not merely by denying him the “value” of the collateral as the majority contends, but also by delaying foreclosure. The cost of the delay additionally entails the income lost by the secured creditor *377 while he is stayed from re-lending the value of the collateral. Put differently, the secured creditor is not so much deprived of a particular piece of property as he is deprived of the use of that property to obtain a certain amount of money at a certain time. The delay resulting from bankruptcy thus imposes a lost opportunity cost, measured upon the nominal value of the collateral, which would not beset the secured creditor under state law. An interpretation of § 361 that effectuates the adequate protection of the “value of the entity’s interest in the debtor’s property” must recognize the time-value of the secured creditor’s rights.
The majority do not deny that lost opportunity cost is a real, measurable damage inflicted on a secured creditor by the delay inherent in bankruptcy proceedings. Nonetheless, their lengthy exegesis of pre-Bankruptcy Code law and legislative history concludes that a secured creditor can not be “adequately protected” for delay damage.[5] The majority’s limitation on the “value of the entity’s interest in the debtor’s property” thus subverts the basic goal of secured transactions and fails to construe § 361 to minimize interference with state-law rights of the secured creditor, as required by Butner.
Contrary to the majority opinion, the Ninth Circuit has held that the expansive phrase “the value of an entity’s interest in such property” demonstrates a “general intention to protect a broad range of secured creditors’ interests.” American Mariner, 734 F.2d at 430. The secured creditor’s right to take possession of and sell the collateral and his right to reinvest the proceeds of sale are valuable rights included in this phrase. 734 F.2d 430-31. Indeed, the House Report accompanying passage of the Bankruptcy Code emphasized the breadth of adequate protection:
It is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy law. Thus, this section recognizes the availability of alternate means of protecting a secured creditor’s interest. Though the creditor may not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.
H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 5787, 6295.
Further support for interpreting the value of a secured creditor’s interest to include the cost of delay in realizing upon its collateral derives from the term “indubitable equivalent” in § 361(3). This is a term of art, understood since Judge Learned Hand’s opinion in In Re: Murel Holding Corp., 75 F.2d 941 (2d Cir.1935), to require compensation of the secured creditor for the time-value of its rights in collateral. Judge Hand explained adequate protection as follows:
In construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that “adequate protection” must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence, (emphasis added)
*378 75 F.2d 942. The opinion went on to require that the secured creditor be paid interest on the value of its collateral following confirmation of a plan of reorganization. “Indubitable equivalent” also appears in 11 U.S.C. § 1129(b)(2)(A)(iii), where it specifically complements a present-value component to a secured creditor’s rights in the event a plan is “crammed down” over his objection. In this section, Murel Holding is codified.
The majority do not deny Judge Hand’s meaning when he used the phrase, or the significance that his meaning may hold for construing § 361(3). The majority acknowledge the plausibility of the statutory construction reached in American Mariner and numerous cases following it. See In re Deeter, 53 B.R. 623, 626 (Bankr.N.D.Ind.1985). Despite these concessions, the majority overcome the “plain meaning” of the statute by concluding that they “do not place significant weight on the action of the conferees when they added the phrase ‘indubitable equivalent’ to § 361.” One may agree with the majority that the legislative history does not explain why “indubitable equivalent” was introduced into § 361(3). But see majority opinion fn. 28, acknowledging that Congress had the idea of compensation for time-delay before it. After considerable speculation concerning what may or may not have happened in Congress, the majority arrives at its ultimate proposition: that Congress was unaware of the origin and meaning of “indubitable equivalent.” In light of the specific Congressional approval of Judge Hand’s concept of adequate protection in § 1129(b)(2)(A) this seems most unlikely; and curious effect of the majority’s legislative analysis is to religate the effect of “indubitable equivalent” to that of a mere precatory expression in § 361(3), while according it full scope in § 1129(b)(2)(A). A sounder and more logical view would be to interpret the phrase to require recognition of compensation for delay in both sections of the statute. Consistency in the meaning of language in a statute — and most certainly that of words of art — is not only a virtue, it is a hallmark of faithful statutory construction.
The majority, in sum, have construed the plain meaning of the statute by ignoring significant portions of its express language and by relying instead on what was not said in Congressional hearings.
The majority’s method of statutory construction by omission reappears in the en banc supplement to the majority opinion concerning the Family Farmer Act.[6] The majority fail to note that Congress there was able to find the words needed to limit adequate protection to the value of the secured creditor’s collateral. Certainly, the Family Farmer Act hearings in Congress evoked testimony from witnesses who disliked the perceived impact of American Mariner adequate protection requirements upon farmers, and Congress considered this in amending Title 11. Contrary to the implication of the majority, however, that “virtually all” of the witnesses “excoriated” American Mariner, half of the witnesses, including a bankruptcy judge and the representative of the prestigious National Bankruptcy Conference, did not seek any statutory rejection of American Mariner, and at most, some of them advocated only a mitigation of its perceived effects.
The Family Farmer Act itself proves that Congress did not reject a secured creditor’s right to receive adequate protection of lost opportunity cost.[7] Congress removed the *379 “indubitable equivalent” test and nominally confined adequate protection in family farmer cases to the value of the collateral. However, it substituted a provision, 11 U.S.C. § 1205(3), allowing payment of “reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property ...” Provision of adequate protection by rent rather than “opportunity cost” payments to secured creditors, to the extent these concepts actually differ, squarely recognizes the secured creditor’s entitlement to compensation for delay during bankruptcy. Rent is the quintessential measure of the time-value of real property. According to the majority, “this gives the bankruptcy judge the flexibility to award some compensation to the secured creditor____” Indeed it does. Poignantly, farmers in the Fifth Circuit will henceforth bear a higher adequate protection burden under this “relief” provision of the Family Farmer Act than will non-farm debtors. Congress could not have intended this cruel paradox.[8]
As an adjunct to rejecting the meaning of § 361 endorsed by American Mariner and two other circuit courts, the majority cite the alleged inconsistency between payments of “interest” as American Mariner adequate protection and allowance of “interest” on claims pursuant to §§ 502(b)(2) and 506(b). This dichotomy is fundamentally flawed and diverts attention from the broad scheme of the Bankruptcy Code, which is fully consistent with providing compensation for lost opportunity costs as an administrative expense. The “interest provisions” set forth two general principles. First, no claim by a secured or unsecured creditor against the debtor’s estate is ordinarily allowed for interest “unmatured” at the date of the bankruptcy filing. 11 U.S.C. § 502(b)(2). Accounting for the claims owed by the debtor at the date of bankruptcy thus avoids the complexity of frequent and uneven calculations of post-petition interest. Second, § 506(a) divides the secured claim into a secured portion, based on the value of the creditor’s collateral, and an unsecured portion which is treated like any other general unsecured claim. Section 506(b), itself an exception to § 502(b)(2), allows' claims by oversecured creditors to include accrued interest at the contract rate, as well as attorneys’ fees and other costs provided by the agreement with the debtor.
These “interest” provisions must be viewed in the context of the purpose of § 502 as a whole. Section 502, as qualified by §§ 506(a) and (b), defines on a balance-sheet basis the claims against the debtor for purposes of making payments to creditors whenever a plan or liquidation is accomplished, if there is any dividend. Section 502 also constitutes a balance-sheet for other purposes, purposes such as classifying creditors [§ 1123(a)(1)], determining the amount of claims for voting purposes [§ 1126(c) ], disclosing particular payments made pursuant to a plan [§ 1129(a)(4) ], and enabling a determination of the feasibility of a plan [§ 1129(a)(ll) ]. The § 502(b) “interest” provision, like the other balance- *380 sheet functions of § 502, is subject to qualification as necessary to accomplish certain goals within the Bankruptcy Code. The treatment of oversecured creditors under § 506(b) has been noted. Additionally, § 726(a)(5) entitles unsecured creditors to payment of post-petition interest before the debtor may receive anything. If the majority’s contention that § 502(b) bars post-petition interest for undersecured creditors is correct, then undersecured creditors are inexplicably and irrationally denied the protection conferred on unsecured creditors by § 726(a)(5). In a major exception to § 502(b)(2), § 1124 specifically permits reinstatement of a debt according to its original contract terms if the debtor brings current the payments of principal and interest accrued during bankruptcy. Section 502(b)(2) is not so seamless a web, excluding all payments of “interest”, as the majority suggests.
Moreover, Section 506(b) should be viewed not as an inferential limit on the treatment afforded secured creditors, but as a baseline guarantee of the rights of the oversecured creditor. By this reckoning, the oversecured creditor maintains a safe harbor in § 506(b) and need not even seek adequate protection in court. Allowance of his full contract claim against the debtor is assured. Of course, if the bankruptcy, by delay or otherwise, threatens the security of this creditor, he may seek relief under § 361. To say that the undersecured creditor lacks the definitive safe harbor is not to conclude that he receives no protection at all. The extent of the undersecured creditor’s right to adequate protection must be decided by the court, however; and it differs from his contract rights with the debt- or. Section 506(b) therefore constitutes an alternative to, rather than a limitation upon, the secured creditor’s right to adequate protection. See Amicus Brief of Prof. Thomas H. Jackson at 26-28.
To suggest that adequate protection for lost opportunity cost conflicts with the “interest” provisions proves too much; so, in theory, do adequate protection payments to secured creditors under § 361 for depreciation, for maintaining the taxes and insurance payments on property, and for paying senior debt in order to protect a junior lienholder. In each case, payments are being made on behalf of the secured creditor during bankruptcy apart from and in addition to his right to file a claim for principal and accrued interest at the date of bankruptcy. Yet the majority do not quarrel with these other extra-contractual payments. The “interest provisions” are not themselves fully consistent with the majority’s position. Under § 506(a), a secured creditor’s claim may be valued at different times during the bankruptcy for different purposes under the Code [e.g., § 502 allowance of claim, § 364 borrowing, §§ 362 or 363 adequate protection, § 1129(b) cram-down]. A secured creditor could obtain a valuation early in the case that would entitle him to receive adequate protection for depreciation of the collateral and later, under § 506(b), be found “oversecured” so as to demand full contract interest. This may present an unusual case, but it is clearly allowed by the Bankruptcy Code and is no more incongruous than reconciling opportunity-cost adequate protection with the “interest provisions.”
The fact is that adequate protection payments of any sort are different from the restrictions created by the “interest provisions.” The Bankruptcy Appellate Panel, which ruled against American Mariner’s secured creditor before that case reached the Ninth Circuit, stated, “we do not agree with the court below that there is a negative implication to be derived from § 506(b) which is applicable to § 361.” 27 B.R. 1004,1009 (1983). First, “unmatured interest” proscribed by § 502 or allowed under § 506(b) accrues at the contract rate on the entire amount owed by the debtor. Adequate protection, however, is based on a § 506(a) valuation of the collateral only, whether for depreciation or for lost opportunity cost purposes. Second, the market rate of interest rather than the contract rate governs adequate protection payments made pursuant to American Mariner. See Fortgang and Mayer, Valuation in Bankruptcy, 32 UCLA L.Rev. 1061, 1088 *381 (1985). Third, opportunity-cost adequate protection compensates only for the delay caused by bankruptcy. Payments of this sort would not ordinarily commence at the filing of a bankruptcy petition, but only following the date when the secured creditor, absent bankruptcy, could have foreclosed upon his collateral. American Mariner, 734 F.2d at 435 n. 12.
Fourth, in contradistinction to contract interest, adequate protection for lost opportunity cost need not comprise cash payments at all. American Mariner emphasized that payments to the secured creditor are “by no means the only method” of providing adequate protection, 734 F.2d 435, as § 361 explicitly states. For instance, if the debtor owned an office building or real estate development in the process of completion at the date of bankruptcy, and if he offered to complete construction or to embark on an ambitious sales or leasing program as adequate protection for the secured creditor, these activities might suffice and supplant the need for any adequate protection payments for lost opportunity cost. The majority focus on cash payments to exaggerate the perceived conflict between American Mariner and the “interest provisions.”[9]
Compensating the secured creditor for its lost opportunity cost due to bankruptcy delay is consistent with the treatment of all other “administrative” costs of the bankruptcy proceeding. The costs of doing business as a debtor are paid currently and in full during the proceeding, and, whether they are incurred for attorneys and accountants, for the purchase of goods, or for payment of a post-petition tort claim, are borne by the debtor and its unsecured creditors. 11 U.S.C. §§ 328, 330, 503(b), 507(a)(1), 726. The majority has mistakenly suggested that “all creditors generally share some of the risk”: section 506(c), however, allows the estate to recover from a secured creditor only the necessary costs and expenses of preserving or disposing of the collateral. Additionally, the Bankruptcy Code is permeated by requirements of special administrative payments during a case to special varieties of creditors. A lessor is entitled to have all prepetition defaults cured within a short period after bankruptcy before he need suffer the continued tenancy of a bankrupt. 11 U.S.C. § 365(b). Any party to an “executory contract,” such as a long-term supply contract or an oil and gas operating agreement, may similarly obtain from the debtor full performance plus additional “assurance” as the quid pro quo for continued dealings. Id. Section 1110 allows repossession of aircraft or vessels subject to certain financing arrangements if, within 60 days of the filing, all defaults are not cured. The obligations covered by these provisions are funded by the debtor and its unsecured creditors.
An undersecured creditor, no less than a lessor, has property at risk during the reorganization. He is “doing business” with the debtor by virtue of a forced loan of his collateral. American Mariner recognizes, as do the majority, that the true cost of the secured creditor’s forced loan includes the time-value of delay in foreclosing. American Mariner draws an implicit and reasonable analogy between the rights of a secured creditor under §§ 361(1) and (3) and post-petition “administrative rent,” which the debtor must continue to pay currently after seeking protection in bankruptcy. 11 U.S.C. § 503(b). “Administrative rent” *382 typically includes both projected depreciation of the leased property plus a return on the lessor’s investment and thus recognizes the potential income from alternative uses. 2 Collier on Bankruptcy ¶ 365.03 (15th Ed.1986). The Family Farmer Act, as previously noted, has codified this analogy.
Under the foregoing analysis, the only “inconsistency” between administrative payments of any kind during bankruptcy and the § 502 scheme for allowance of claims lies in Congress’s decision to require the debtor, as his cost of taking advantage of bankruptcy’s automatic stay and opportunity for discharge of debt, to pay his post-petition expenses and certain other obligations currently. Treating as an administrative expense the adequate protection of the secured creditor’s “interest in the debtor’s property,” including lost opportunity cost, is a wholly different matter from the § 502(b)(2) balance-sheet disallowance of claims for unmatured interest on the contract.[10]
The statutory and legislative history arguments of the majority have been analyzed. Their policy views must also be addressed. Pervasive in the original panel opinion, reinstated by the majority, was the notion that if American Mariner is correctly decided, a massive transfer of assets from unsecured creditors to undersecured creditors will result, aborting the reorganization process. This seems to be the basic concern that led the majority to traverse the holdings of three circuit courts and most of the bankruptcy courts in this circuit. The majority’s fear is based on a misperception of the nature of most Chapter 11 filings under the Bankruptcy Code. It obscures the peril in which an undersecured creditor is placed by the filing of a Chapter 11 petition and ignores the benefit that his peril confers in the form of a forced loan of his collateral to the debtor. Finally, while conceding that American Mariner may provide a vehicle whereby the debtor can remain in reorganization with the cooperation of the secured lender for a period of time, the majority incredibly suggest that such an outcome could prejudice the unsecured creditors.
The majority have assumed that all or most Chapter 11 reorganizations have a right to life which is endangered by the prospect of payment of adequate protection for the secured creditor’s lost opportunity cost. The sad fact is, on the contrary, that the vast bulk of reorganizations culminate in liquidation by a plan, conversion to Chapter 7, or withering away during the bankruptcy proceedings. Over the last five years, the Administrative Office of the United States Courts reports that 90% of Chapter 11 cases nationwide failed to terminate within the provisions of Chapter 11. Of those in which plans are confirmed, the experienced bankruptcy practitioner knows that many plans call for liquidation of the debtor’s assets. Thus, the concern that American Mariner adequate protection frustrates the “reorganization policy” of bankruptcy law is irrelevant to the 90% of cases which ultimately liquidate. Compare Jackson, Of Liquidation, Continuation, and Delay: An Analysis of Bankruptcy Policy and Non-Bankruptcy Rules, 60 Am.Bankr.L.J. 399, 416 (1986).
The actual impact of American Mariner in unreorganizable cases should be favorable for secured and unsecured creditors *383 alike. A hapless Chapter 11 effort may be kept aloft, absent American Mariner, for years, given moderately astute debtor’s counsel, a court too busy or too docile to terminate the case, and a steady cash flow. The debtor survives in the meantime by consuming its assets, including any going-concern surplus that may have originally existed in the company, by suffering piecemeal foreclosures or, in some cases, by siphoning off cash and assets illegally. To the extent that a secured creditor is entitled to adequate protection to compensate for the opportunity cost of delaying foreclosure, his right takes the profit out of the debtor’s standard tactic of delay. If the debtor is thus forced to close down sooner than it otherwise would have, some equity may remain for the unsecured creditors and they will be paid sooner. The administrative carrying costs of bankruptcy, including attorneys’ and other professionals’ fees, are reduced in this situation, where they would ultimately have been spent for naught. Shortening the bankruptcy proceeding by the threat of an award of American Mariner adequate protection (since in this type of case it is unlikely that any payments would ever be made) cannot possibly favor the interest of secured creditors over unsecured creditors. Both classes share its benefits. Moreover, there is a social gain from rendering bankruptcy more expeditious and facilitating the transfer of assets from nonproductive to productive ventures.
This case exemplifies the horde of hopeless bankruptcy cases in which the national reorganization policy is irrelevant. A one-asset limited partnership, Timbers has no full-time employees and no business except the rental of one unit of apartments. Its major unsecured debt is owed to the insider management company, while the rest of the unsecured debt totals $17,000. United Savings is the only secured creditor. Award of adequate protection based on lost opportunity cost does not thwart the debt- or’s right to reorganize if there was nothing to reorganize in the first place.[11]
This Court unanimously endorses tighter supervision of bankruptcy cases such as this by both the lower courts and interested parties to limit patent abuses of Chapter 11. Consequently, the majority’s extended discussion of creditor remedies available under the Bankruptcy Code is helpful, if somewhat pallid compared with the overriding concern for the debtor and “reorganization policy” expressed in the original panel opinion. The trouble with creditors’ remedies (e.g., lifting the automatic stay because the property is not necessary to an effective reorganization [§ 362(d)(2) ], seeking conversion to Chapter 7 or appointment of a trustee [§ 1112], and limiting the debt- or’s exclusivity period [§ 1121]) is that in practice, as shown by the case statistics, they have not been enforced. Thus, the majority’s exhortation that bankruptcy courts be “sensitive” to creditors’ rights under the Bankruptcy Code is an unsatisfactory substitute for enforcing the statutory requirement that adequate protection include compensation for a secured creditor’s lost opportunity cost.
What will be the effect of adequate protection for lost opportunity cost in the few cases that have a realistic chance to reorganize? I believe that, contrary to the panel’s opinion, American Mariner motivates all parties to the case to reach a prompt agreement to a plan. At the very least, it will galvanize the debtor, who is always the key figure in arriving at a successful plan. The objective candidate for a successful Chapter 11 reorganization is not hard to describe: it has some cash and a decent cash flow, encumbered or not; it has at least some lines of business that are profitable or nearly so; it has good management; and it is not facing a disastrous economic forecast in all of its markets. Given those conditions, if a court awards adequate protection recognizing the secured creditor’s *384 cost of delaying foreclosure, the debtor will not usually collapse, because it can afford some level of such protection; but it will propose a plan. Aside from debtor procrastination, the most significant source of delay in the potentially successful cases is bickering among creditor groups. American Mariner forces creditor groups to focus their attention rapidly on a potentially dwindling pie. Even if the panel is correct in its assertion that a secured creditor receiving adequate protection payments for lost opportunity cost would be disinclined to negotiate (a conclusion I do not share), the cram-down provision of the Bankruptcy Code, § 1129(b), takes the matter of delay out of the secured creditor’s hands and always creates settlement incentive.
Two other points should be made about American Mariner’s impact on the reorganizare company. First, in such a case, the majority’s fear that payments to secured creditors will swamp the ship within a few weeks or months of the bankruptcy filing is misplaced. Both American Mariner and Grundy, the Fourth Circuit case, delay imposing opportunity-cost adequate protection in accord with the time ordinarily needed to effect a foreclosure and sale under state law. The court below triggered payments in six months from its ruling. An automatic breathing-space results for the debtor. Second, the panel’s concern that American Mariner subverts the reorganization process by transferring the cost from secured to unsecured creditors depends upon one’s point of view. If the effect of American Mariner in the reorganizare case is to speed up the proceedings, this fact alone should benefit unsecured creditors by reducing the transaction costs of the bankruptcy. Also, to the extent that adequate protection for lost opportunity cost is taken into account in the formulation of a plan, reducing the principal on outstanding debt, encouraging the secured creditor to modify his security or to cooperate in stretching out payments after bankruptcy, the debtor’s and unsecured creditors’ prospects are ultimately improved.
Providing adequate protection to the secured creditor for his lost opportunity cost occasioned by bankruptcy is not the foe of the reorganization process. I can do no better to summarize the position of the dissent than to quote from American Mariner:
The secured creditor’s right to take possession of and sell collateral on the debtor’s default has substantial, measurable value. The secured creditor bargains for this right when it agrees to extend credit to the debtor and both parties consider the right part of the creditor’s bargain. The right constitutes an “interest in property” that is “created and defined by state law,” and we are aware of no federal interest that requires this right of the secured creditor to go unprotected “simply because an interested party is involved in a bankruptcy proceeding.” See Butner v. United States, 440 U.S. 48, 54-55, 99 S.Ct. 914, 917-18, 59 L.Ed.2d 136 (1979). The Court in Butner observed that “[ujniform treatment of property interests by both state and federal courts within a State serves ... to prevent a party from receiving ‘a windfall merely by reason of the happenstance of bankruptcy.’ ” 440 U.S. at 55, 99 S.Ct. at 918 (quoting Lewis v. Manufacturers National Bank, 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961)). To the extent that the debtor in bankruptcy can prevent the secured creditor from enforcing its rights against collateral while the debtor benefits from the creditor’s money, the debtor and his unsecured creditors receive a windfall at the expense of the secured creditor.
We conclude that sections 361 and 362(d) were drafted to preclude such a windfall and to insure that the secured creditor receives the benefit of its bargain. We are satisfied that our holding in this case will not inhibit successful reorganization but rather will promote among other things the ready availability of affordable credit.
I respectfully DISSENT.

. This case verges on presenting a hypothetical controversy to the court, because Timbers’ present cash flow is tens of thousands of dollars less than monthly debt service payments and the likelihood that Timbers will be able to reorganize is virtually nil. This was conceded by debtor’s counsel in oral argument. As no fact finding was made on that issue below, and the parties being intent on achieving a definitive resolution of the adequate protection issue, I reluctantly conclude that the case should be decided by our court. It is indeed unfortunate, however, that nothing turns on the outcome of our decision in this case for these parties.

. In re Briggs Transportation Company, 780 F.2d 1339 (8th Cir.1985); Grundy National Bank v. Tandem Mining Corp., 759 F.2d 1436 (4th Cir.1985); In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir.1984).

. The majority erroneously limit the scope of §§ 361(1) and (2) to declines in the value of the collateral due to its use, sale or lease. The subsections also protect against declines caused by the stay itself. The most pervasive damage caused by the stay, as will be seen, is the cost of delay.

. Protection of the collateral may be all a secured creditor is entitled to receive from a constitutional standpoint. See Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); Comment, Compensation of Adequate Protection During the Automatic Stay in Bankruptcy, 50 U.Chi.L.Rev. 305, 310 (1983).

. Paradoxically, this conclusion means that § 361 of the Bankruptcy Code, which was intended to protect the secured creditor, instead coerces him by allowing the clock to run against his uncompensated opportunity cost.

. It is necessary to discuss the Family Farmer Act because the majority dwelt on its significance at length in their supplemental opinion. Our purpose is to show that signals emanating from the Family Farmer Act, although problematic, reflect in favor of the position espoused by this dissent." ... [Wjhile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one ..., such views are entitled to significant weight ... and particularly so when the intent of the enacting Congress is obscure." Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980).

. The majority would limit the significance of this bill where it conflicts with their position by contending that Congress addressed only a limited problem — relief for bankrupt farmers — and for this reason did not do away with American Mariner wholesale. It is worthwhile to point *379 out, however, that Congress, as part of the Family Farmer Act, also amended the Bankruptcy Code to prevent discharge of administrative support judgments and remedy a problem existing in general bankruptcy law. 11 U.S.C. § 523(a)(5), amended by P.L. 99-554 § 281. Congressional vision thus extended beyond the plight of farmers, but did not reach out to repeal American Mariner.

. That Congress, while enacting special treatment in bankruptcy for farmers, inferentially approved the American Mariner concept of adequate protection for other debtors is supported by legislators’ comments at the passage of the Family Farmer Act. Cong.Rec. 15074-15092, Oct. 3, 1986. Senator DeConcini referred to "revision of long held doctrines of the bankruptcy code such as ... adequate protection.” Id. at 15092. Concern was expressed by Senators Thurmond and DeConcini that Congress may have tilted too far from prior concepts of adequate protection and the absolute priority rule in its efforts to assist farmers. Senator DeConcini questioned whether the farm credit system could stand the massive write-downs of debt portended by this "extraordinary,” "experimental" legislation. The temporary nature of the program (seven years) was emphasized. This Court does not enjoy the luxury of devising a temporary exception to its construction of the adequate protection provision in § 361.

. The majority suggest that "logical inconsistencies have erupted in lower court decisions” concerning the timing and interest rate applicable to American Mariner payments, as an argument against the validity of the decision. Section 361’s adequate protection requirements across the board have been the most heavily litigated section of the Bankruptcy Code. That stems from their generality, from their being based on difficult and easily variable valuations of property, and from their overriding importance to the protection of secured creditors. The valuation of lost opportunity cost is a fact-specific finding, dependent upon the valuation of collateral in issue, assessing the consequences under state law if the lender were to institute foreclosure, and the applicable interest rate. See also Fortgang & Mayer, 1986 Interest & Costs for the Secured Creditor in Bankruptcy, article presented at 1986 NYU Bankruptcy Law Seminar.

. The majority argue at length that adequate protection cannot include payments for lost opportunity cost because that principle leads to "logical inconsistencies” connected with the confirmation of plans of reorganization. The existence of such inconsistencies was noted by Fortgang & Mayer, Valuation in Bankruptcy, supra, cited by the majority. Fortgang & Mayer have subsequently commented on this citation as follows: "Like the authors, whose analysis she cited, Judge Randall found difficulty in reconciling American Mariner interest with various sections of the Code____ Unlike the authors, whose contrary conclusion she did not cite, Judge Randall found such difficulty reason to reject American Mariner." Fortgang & Mayer, 1986 Interest and Costs for the Secured Creditor in Bankruptcy, paper prepared for NYU bankruptcy law seminar. In any event, the reconciling of American Mariner payments with confirmation provisions of the Code is a highly speculative, hypothetical, and complex enterprise, which is not presented by the facts of this case and should not be here decided. Messrs. Fort-gang and Mayer have admirably explored the necessary reconciliations in their two articles.

. As the Family Farmer Act in part demonstrates, not every single-asset bankruptcy case is filed in bad faith. Timbers, however, shares a predicament with many single-asset cases which may be vulnerable to dismissal or lifting the automatic stay on the ground that bankruptcy was filed in bad faith. See In Re: Little Creek Development, 779 F.2d 1068 (5th Cir.1986).